[S.F. No. 22832. In Bank. June 9, 1972.]

CITY OF LOS ANGELES et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

[S.F. No. 22828. In Bank. June 9, 1972.]

WILLIAM M. BENNETT et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

[S.F. No. 22833. In Bank. June 9, 1972.]

CALIFORNIA PUBLIC INTEREST LAW CENTER et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Real Party in Interest.

(Consolidated Cases.)

## COUNSEL

William M. Bennett, in pro. per., Roger Arnebergh, City Attorney, Charles E. Mattson, Deputy City Attorney, John W. Witt, City Attorney, William H. Kronberger, Jr., Deputy City Attorney, Thomas M. O'Connor, City Attorney, Milton H. Mares and William F. Bourne, Deputy City Attorneys, W. Keith Woodmansee, Michael M. Stein, Rinaldo S. Brutoco and Mark A. Ivener for Petitioners.

Mary Moran Pajalich, Timothy E. Treacy, Hector Anninos, J. Calvin Simpson and Scott K. Carter for Respondents.

Pillsbury, Madison & Sutro, John A. Sutro, Noble K. Gregory, George H. Eckhardt, Richard W. Odgers and Francis R. Kirkham for Real Party in Interest.

Frederick T. Searls, John C. Morrissey and Malcolm H. Furbush as Amici Curiae.

## OPINION

**PETERS, J.**—In these consolidated proceedings we review Decision No. 78851 of the Public Utilities Commission which authorizes intrastate telephone rate increases in the amount of $143 million annually. We have issued a partial stay providing that all sums collected by Pacific Telephone and Telegraph Company pursuant to the rates authorized by the decision shall be subject to refund in whole or in part upon order of this court should the decision or Decision No. 77984 of the commission be annulled or modified. The latter decision, which related to the calculation of Pacific's federal income tax expense for rate making purposes was rendered during the course of the proceedings which subsequently resulted in the instant rate decision, and we recently annulled the tax expense decision in *City & County of San Francisco* v. *Public Utilities Com.*, 6 Cal.3d 119 [98 Cal. Rptr. 286, 490 P.2d 798].

In *Pacific Tel. & Tel. Co.* v. *Public Util. Com.*, 62 Cal.2d 634, 644-645 [44 Cal.Rptr. 1, 401 P.2d 353], the commission's general approach was described as follows: "It appears that in telephone rate proceedings in California the general approach employed by the commission, and followed in the present case, is to determine with respect to a 'test period' (1) the rate base of the utility, i.e., value of the property devoted to public use, (2) gross operating revenues, and (3) costs and expenses allowed for rate-making purposes, resulting in (4) net revenues produced, sometimes termed 'results of operations.' Then, by determining the fair and reasonable rate of return to be fixed or allowed the utility upon its rate base, and comparing the net revenue which would be achieved at that rate with the net revenue of the test period, the commission determines whether and how much the utility's rates and charges should be raised or lowered. . . . The test period is chosen with the objective that it present as nearly as possible the operating conditions of the utility which are known or expected to obtain during the future months or years for which the commission proposes to fix rates. The test-period results are 'adjusted' to allow for the effect of various known or reasonably anticipated changes in gross revenues, expenses or other conditions, which did not obtain throughout the test period but which are reasonably expected to prevail during the future period for which rates are to be fixed, so that the test-period results of operations as determined by the commission will be as nearly representative of future conditions as possible."

The same general approach was followed in the instant proceedings, using 1970 as the test year.

In 1961, section 1705 of the Public Utilities Code was amended to provide that ". . . the commission shall make and file its order, containing its decision. The decision shall contain, *separately stated, findings of fact and conclusions of law* by the commission *on all issues material to the order* or decision. . . ." (Italics added.)

In *California Motor Transport Co.* v. *Public Utilities Com.,* 59 Cal.2d 270, 273-275 [28 Cal.Rptr. 868, 379 P.2d 324], this court reviewed a commission order applying the new scope of review dictated by the amendment of section 1705. We held that a finding of "public convenience and necessity" was an ultimate finding and that to be sustained by the court "[e]very issue that must be resolved to reach that ultimate finding is 'material to the order . . . .' " and must be separately stated. The decision left to the commission the discretion to determine the factors material to public convenience and necessity but held that section 1705 requires it to state what those factors are and to make findings on the material issues which ensue from the factors.

It has been repeatedly emphasized that separate findings are essential to "afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily, as well as assist the parties to know why the case was lost and to prepare for rehearing or review, assist others planning activities involving similar questions, and serve to help the commission avoid careless or arbitrary action." (*Greyhound Lines, Inc.* v. *Public Utilities Com.* 65 Cal.2d 811, 813 [56 Cal.Rptr. 484, 423 P.2d 556]; *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 648; *California Motor Transport Co.* v. *Public Utilities Com., supra,* 59 Cal.2d 270, 274-275.) We must review the findings accordingly.

## FEDERAL TAX EXPENSE

Our decision annulling the commission's tax expense decision in *City & County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, was filed after the commission had established the rates before us. The commission in the instant decision in fixing the amount of Pacific's federal tax expense followed its tax expense decision. Since the latter decision was annulled, the instant decision must also be annulled.[1]

---

[1]It is not clear how much of the $143 million annual increase is due to the commission's change in the treatment of federal tax expense. As pointed out in our opinion in *City & County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d

The fact that the commission reopened the proceedings with respect to the question of federal income tax expense after our decision does not militate against this conclusion. In *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656, the commission commenced an investigation into the lawfulness of Pacific's rates, after lengthy hearings it concluded that the rates were excessive, it ordered new, lower rates, and it ordered a refund of excessive rates in the amount of $80 million collected by Pacific during the pendency of the rate proceedings. We annulled the refund order on the ground that general rate making is legislative and looks to the future, that the Legislature has authorized rate changes only for the future, and that the commission did not have power to order refunds on the ground of unreasonableness where the rate had been previously found to be reasonable. It follows that, unless the rate order now before us is annulled, it will become a lawful rate and that all funds collected pursuant to it would belong to Pacific and not be subject to refund.

In other words, we must annul the rate order now before us, because otherwise the rates therein, which are based in part on the annulled tax expense decision, will become lawful rates for the future and will preclude refunds.

### STATE TAX EXPENSE

The commission concluded that for purposes of computing the expense allowance for Pacific's state corporation franchise tax liability, it would follow the same accounting procedures as to depreciation as the federal tax expense computation, i.e., accelerated depreciation with normalization. Under the commission's 1968 decision, the accounting procedure followed was imputed accelerated depreciation with flow through.

Accelerated depreciation for tax purposes results in a tax saving or deferral. (See *City & County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 123.)

The problem presented is whether the tax saving or tax deferral should inure to the benefit of the ratepayer in the form of lower rates or whether the tax saving or deferral should be retained by the utility with no reduction in rates. When the saving is passed on to the ratepayer, the accounting procedure is called accelerated depreciation with flow through.[2] When

119, 125, the commission refused to take evidence. The dissenting commissioners in Decision No. 77984, *supra,* estimated that the increased rates in the next 10 years due to the commission's tax expense decision would be between 750 million and one billion dollars.

[2]Apparently, all utilities in California except Pacific and General Telephone follow accelerated depreciation with flow through as to both federal and state income tax

the saving is retained by the utility, the accounting procedure is called accelerated depreciation with normalization.[3]

In the decision which we annulled the commission held that Pacific's *federal* income tax expense would be computed for rate making purposes on the basis of accelerated depreciation with normalization, and in the instant decision the commission concluded that *state* corporation tax expense would also be computed on the basis of accelerated depreciation with normalization.[4] The commission reasoned: "If Pacific were to adopt 'flow-through' accounting for state income taxes using accelerated depreciation, it would not appear to be in compliance with the prerequisites in the Internal Revenue Code that a taxpayer such as Pacific must use the 'normalization method of accounting' to qualify for the use of accelerated depreciation for federal income tax purposes. In any event, the state income taxes are a relatively small portion of total income taxes paid by Pacific. Under these circumstances it is not warranted to consider different accounting and rate-making treatment for state than for federal taxes. We find that the staff was correct in basing its determination of revenue requirement in Exhibit No. 66 on the use of normalization for both state and federal income taxes. This avoids the possibility of jeopardizing the much larger federal income tax deferrals."

The above quoted matters constitute the only discussion by the com-

---

expense. Pacific and General Telephone have apparently in the past used straight line depreciation. In 1968, the commission, recognizing that it could not compel Pacific and General Telephone to change its tax practices, nevertheless concluded that the two corporations were acting imprudently and determined that for purpose of rates, it would *impute* accelerated depreciation to them with flow through of the *imputed* tax savings to the ratepayer.

[3]Accelerated depreciation with normalization means that the utility pays its income or franchise tax on the basis of accelerated depreciation. The commission, for rate purposes, then recomputes what would have been the tax liability if straight line had been used, and this amount is treated as the tax expense to be recovered by the utility through its rates as an expense of doing business. The difference between the actual liability for taxes of the corporation and the recomputed taxes on the basis of straight line is then set up on the books as a reserve for deferred taxes.

The system followed by nontelephone utilities, accelerated depreciation with flow through, is that the utility pays taxes on the basis of accelerated depreciation and the actual tax expense is the amount allowed as tax expense for rate purposes.

The third system, *imputed* accelerated depreciation with flow through, which was applied to Pacific and General Telephone in 1968, is that the utility pays its taxes on the basis of straight line depreciation but the commission recomputes those taxes as if accelerated depreciation had been used, and only this latter figure is allowed as a tax expense for rate purposes.

[4]The federal tax expense decision was based on a change in federal tax law. There has been no comparable change in our corporate franchise tax law. Thus, the commission could not and did not in the instant decision rely on the grounds in the federal decision.

mission of the depreciation allowance as to state corporation franchise taxes. We have annulled the decision of the commission establishing accelerated depreciation and normalization as the method of computation of federal tax expense in *City & County of San Francisco, supra*. Since the sole basis for the instant decision as to state taxes was the annulled decision as to federal taxes, the instant decision, to the extent it relates to the state taxes, cannot be sustained.

Moreover, even if the decision as to the treatment of federal taxes had been permitted to stand, the commission's determination as to state taxes could not be upheld.

The commission's decision may not be upheld on the theory that the amount involved is insignificant. The commission's Table II, Results of Intrastate Operations Under Present Rates—Test Year 1970, reflects that for the test year the adopted federal taxes were $101,800,000 and the adopted state taxes were $19 million. Thus the ratio is approximately five to one. It seems reasonable to assume that the same ratio would apply with regard to tax savings. Thus under the $750 million to $1 billion estimate of rate increase in the next 10 years due to the federal tax decision, there may be rate increases amounting to $200 million in the next 10 years due to the instant decision's treatment of state tax expense. There is no showing before us which would warrant the conclusion that the amount of money involved is negligible; the commission, so far as appears, did not take evidence as to the effect on state tax expense of the instant decision as compared to alternative treatment. Accordingly, it would be improper to assume that only a trivial amount of money is involved, and the commission's decision cannot be upheld on the theory that the importance of the decision as to state tax treatment is minimal.

Nor may the commission's state tax treatment be upheld on a theory of administrative convenience. No additional computations are required to apply accelerated depreciation with flow through. Pacific will be paying its taxes on the basis of accelerated depreciation, and this figure would thus be readily available. Moreover, in order to establish the tax reserve used in normalization, it is essential to calculate in the rate books the tax which will be paid on the basis of accelerated depreciation and which would have been due without accelerated depreciation. (See fn. 3.)

Although the goal of uniformity between treatment of federal and state tax expense may sometimes furnish a basis for adoption of particular rate procedures, uniformity does not justify the state tax treatment adopted by the commission. As pointed out above, federal law and state law are not the same with respect to the use of accelerated depreciation. Thus, the

same considerations do not apply. In the light of the potentially large amount of money involved and the lack of any administrative inconvenience, the limited uniformity sought by the commission as to depreciation would not justify the substantial departure from ordinary principles of rate making.[5]

We cannot agree that to adhere to the ordinary principle of accelerated depreciation with flow through with regard to state taxes would jeopardize Pacific's federal tax benefits.[6]

Section 167(*l*)(2) of the Internal Revenue Code, as amended in 1969, provides: "In the case of any post-1969 public utility property, the term 'reasonable allowance' [for depreciation] as used in subsection (a) means an allowance computed under—

"(A) a subsection (*l*) method [straight line depreciation (see Int.Rev. Code, § 167, subs. (*l*)(3)(f))],

"(B) a method otherwise allowable under this section [such as accelerated depreciation] *if the taxpayer uses a normalization method of accounting,* or

"(C) the applicable 1968 method, if, with respect to its pre-1970 public utility property of the same (or similar) kind most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period." (Italics added.)

Subsection (*l*)(3)(G) defines normalization: "In order to use a normalization method of accounting with respect to any public utility property—

"(i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and

"(ii) if, to compute its allowance for depreciation *under this section,* it uses a method of depreciation other than the method it used for the purposes described in clause (i), the *taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation.*" (Italics added.)

---

[5]We pointed out in *City & County of San Francisco, supra,* that the general rule followed by all nontelephone utilities is accelerated depreciation with flow through. Thus the instant decision represents a departure from the basic principle governing treatment of tax expense. (6 Cal.3d at pp. 124, 129.)

[6]We assume for the purpose of discussion and contrary to fact that we affirmed the federal tax decision of the commission. Of course we annulled it. Since the commission must reconsider the federal tax treatment it is only speculative that there will be any federal tax benefits for Pacific.

When section 167(*l*)(3)(G)(ii) is read as a whole, it is clear that the reserve for deferred taxes need only reflect the deferral of taxes resulting from the use of "such" different methods of depreciation and that such different methods of depreciation mean the difference in the allowance for depreciation "under this section." The term "under this section," of course, refers only to federal taxes and not to state taxes.

For the foregoing reasons, the computation of state tax expense cannot be sustained.

### The Western Electric Adjustment

In prior rate proceedings involving Pacific, the commission generally adopted certain adjustments to Pacific's plant and expenses to establish lower prices than those actually charged Pacific by its affiliated manufacturer, Western Electric Company, Inc. Western is a wholly owned subsidiary of American Telephone and Telegraph Company, and American holds 90 percent voting control of Pacific. The reductions were based on the theory that Western should be entitled to no greater rate of return than would be reasonable for a regulated utility.

In the instant decision, the commission concluded that no adjustment should be made. The commission refused to make the adjustment not only as to current purchases by Pacific from Western but also refused to make the adjustment with respect to equipment and plant purchased prior to 1968, the last year the adjustment was made in setting Pacific's rates.

The commission pointed out that Western during the years 1946 through 1969 had received a return on net equity from its Bell System operations of 10.1 to 10.2 percent. (This, of course, is substantially higher than the return permitted Pacific during the period or in the current proceeding.) The commission found that Western was efficiently operated, and pointed out that section 456 of the Public Utilities Code permits incentives and rewards for a more efficient management of an enterprise.[7]

The basis of the commission's decision is that, as to the activities of Western, a rate of return should be permitted commensurate to an ordinary

---

[7]Section 456 of the Public Utilities Code provides: "Nothing in this part shall be construed to prohibit any public utility from profiting, to the extent permitted by the commission, from any economies, efficiencies, or improvements which it may make, and from distributing by way of dividends, or otherwise disposing of, such profits. The commission may make or permit such arrangement with any public utility as it deems wise for the purpose of encouraging economies, efficiencies, or improvements and securing to the public utility making them such portions of the profits thereof as the commission determines."

manufacturer's rate of return and that when Western is permitted such return, its prices were reasonable.[8]

We extensively considered the Western Electric adjustment in *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 659-662. We set forth the commission's findings as to the corporate affiliation of Pacific, Western and American, as to the dominance of the Bell System in providing telephone service, and as to its advantage in its integrated position of being researcher, designer, engineer, manufacturer, distributor, installer, repairer, junker, and operator of 80 percent of the telephone business in the entire continental United States. Those findings were not disputed by Pacific. We concluded: "The determination of the commission in the present case that Western is entitled to no greater return on its sales to Pacific than Pacific is entitled to earn on its operations, and that American should not be permitted through the corporate instrument of Western to subject Pacific's ratepayers to the burden of providing a greater return, is based not only on extensive findings made by the commission on the subject but also on the methods and principle theretofore followed by the commission . . . and as the commission expressly found herein, produces a fair and reasonable result." (62 Cal.2d at pp. 661-662.) We rejected Pacific's contention that it was error for the commission to omit "to include a finding of fact as to the reasonableness or prudence of Pacific's purchases

---

[8]The commission reasoned: "The intent of Section 456 also should apply to an affiliate of a California utility. It is quite possible that the risks inherent in the manufacturing operations and in the service and supply operations of Western Electric are not quite as great as the operating risks of some of the manufacturers used in the comparative data presented in this proceeding. There is no question, however, that the capital structure of Western Electric is similar to that of manufacturers. There is also ample evidence that Western Electric has been operated in an extremely efficient manner, as compared with other enterprises. Considering the risks and efficiencies of Western Electric's total operations, we deem it reasonable for Western Electric to have earned the returns it realized from 1946 through 1969. No adjustment to the prices charged Pacific for products and services during that period is warranted.

"Further tests of reasonableness are appropriate in reviewing the manufacturing functions and the service and supply functions performed by Western Electric. Also, although manufacturing is not a normal function of a utility, such service and supply functions as purchasing from other manufacturers, storekeeping, installing, repairing and salvaging are normal utility functions. Even though Western Electric did not earn an unreasonably high return on its operations, a downward adjustment in prices charged would be appropriate if Western Electric prices for manufactured products were higher than similar products manufactured by others or if Pacific could perform the service and supply functions at lower cost than the charges by Western Electric. . . . Exhibits Nos. 8 and 8-A show that it would cost at least $14,500,000 more per year for Pacific to duplicate the service and supply functions now performed by Western Electric. These exhibits confirm that no adjustment to Western Electric prices for manufactured products or for services and supplies is warranted at this time."

from Western and payment of the prices charged, . . ." (62 Cal.2d at p. 661.)

We thus determined that, where it appears that a utility enjoys the dominant position shown by the commission's findings, it may not through the use of corporate instrumentalities obtain a greater rate of return than the utility would be entitled to in the absence of the separate corporate entities, and it was not determinative whether the prices charged by one affiliated corporation to another might be considered reasonable. In other words, the utility enterprise must be viewed as a whole without regard to the separate corporate entities, and the rate of return should be the same for the entire utility enterprise.

We see no reason to depart from our holding. A corporation should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activities. In the light of the dominance of the Bell System and its integrated position, we again reject the view that a finding of the reasonableness or prudence of Pacific's purchases from Western would warrant termination of the Western Electric adjustment.

There has been no substantial change since our prior decision as to the dominance of the Bell System or as to the relationship between Pacific, American, and Western. Accordingly, Western must be considered part of the utility enterprise, and its prices should be adjusted to reflect no greater rate of return on its sales to Pacific than Pacific is entitled to earn on its operations. This result cannot be avoided on the basis of a finding that Western's prices were reasonable when compared to other manufacturing enterprises.

The increased rate of return permitted for Western activities may not be sustained on the record before us on the theory that it represents a reward for efficiency. When the commission sees fit to permit a reward for efficiency pursuant to section 456 of the Public Utilities Code (see fn. 7), it must specify the amount of the reward. If the commission, in permitting a reward, fails to specify the amount of the reward, it becomes impossible to review the decision of the commission. Thus, in the instant case, there is no way of separating out the amount of the increased rate of return permitted as a reward for efficiency and no way of determining what part of the increase is due to other factors. In addition, the ratepayers are entitled to know the amount of any rewards included in their rates since it is their money that is being used for the reward. When the commission determines to give away ratepayers' money, it must at least tell the donors how much they are giving.

## New Nonrevenue Producing Capital Expenditures

The commission followed its usual practice in calculating the rate base for the test year 1970 by using an average year rate base. However, the commission then adjusted the figure to reflect that $75 million of 1970 capital expenditures and $80 million of 1971 capital expenditures would be nonrevenue producing. The commission increased the rate base on the basis of those figures in arriving at a pro forma rate base. Also the commission adjusted the depreciation expense, ad valorem taxes, and income taxes.

An executive of Pacific testified that there would be discretionary investment in 1970 and 1971 in the above amounts. The discretionary items were identified as improvements in the service which apparently were not immediately necessary but would be necessary in the long run. ■ The executive listed such items as replacement of older offices, centralized automatic call distributing systems, broad band restoration which permits quicker restoration of service when there is a wreck or fire, improvement of coin boxes so as to better withstand vandalism, undergrounding in residential areas, improved pressurization of cables, and new items of station equipment.

Although the witness did not identify these investments as nonrevenue producing investments but rather as discretionary investments in the sense that they were not required by commission order or to maintain service, it seems apparent that most of the items would not be expected to produce any substantial increase in revenues.

The commission's categorization of nonrevenue producing investment is probably a misnomer; the investments are an important part of the revenue producing system, and it would seem more appropriate to term the investments as investments which will not *increase* revenues rather than nonrevenue producing. With this qualification, the evidence is sufficient to support the commission's finding as to the *amount* of *expenditure* for "nonrevenue" improvements, and the contention that the evidence is insufficient must be rejected.

It is also claimed that the findings of the commission are insufficient to justify the adjustment of the rate base and expenses. The commission stated: "In Exhibits Nos. 75 and 102, Pacific includes alternative 1970 results of operation using a weighted average rate base and a year-end rate base. Pacific contends that the use of a year-end pro forma rate base is justified in this proceeding to offset the erosion of rate of return which is the inevitable effect of inflation. Pacific points out that the Commission

frequently has made an allowance in rate of return to take care of antici-pated attrition in earnings which results primarily from inflation.

"We do not agree that the use of a year-end rate base necessarily is appropriate. For example, if all of the capital additions installed by a utility during the year are directly related to providing service to new customers, the additional net revenues to be received from those new customers normally should also be reflected in the test year if a year-end rate base is to be used. On the other hand, we often have utilized a rate base which was higher than either a weighted average or a year-end rate base when installation of non-revenue-producing plant is imminent. In such cases, the additional plant would be completed before or soon after the new utility rates became effective. Not only would there be no off-setting additional net revenues available to offset the higher investment, there would be additional expenses. Unless the non-revenue-producing plant and related depreciation expense and taxes were 'rolled back' into the test year, the utility would never achieve the rate of return found reasonable by the Commission.

"To determine the rate of return for the test year 1970 for rate-making purposes we will consider how much additional non-revenue-producing plant will have been installed by the approximate midpoint of the first 12 months that the new telephone rates have been in effect. Undisputed testimony of Pacific's vice president in charge of operations shows that about 7,5 million dollars of 1970 capital expenditures and 80 million dollars of 1971 capital expenditures are essentially non-revenue-producing. Only about half of those 1970 expenditures and none of the 1971 expendi-tures would be reflected in a weighted average 1970 rate base and corre-sponding net revenue. When we 'roll back' into the 1970 test year all such non-revenue-producing plant that will have been installed by the end of 1971, including the effect of additional depreciation expense and additional ad valorem taxes, offset in part by lower income taxes which result from the higher assumed expenses and bond interest, the end result should be reasonably close to the return which will be realized by Pacific during the first 12-month period that the new telephone rates are in effect."

The basic approach of the commission in rate making, as pointed out at the beginning of this opinion, is to take a test year and determine the revenues, expenses, and investment for the test year. ■ We pointed out in *Pacific Tel. & Tel. Co. v. Public Util. Com., supra,* 62 Cal.2d 634, 645, that the test period results are adjusted to allow for reasonably anticipated changes in revenues, expenses, or other conditions "so that the test-period results of operations as determined by the commission will be as nearly

representative of future conditions as possible." Within this rule, the commission may adjust all figures, revenue, expense, and investment for anticipated changes but it may not adjust one side or part of the equation without adjusting the other unless there is a finding that the particular expenditure is extraordinary. This was recognized by the commission when it pointed out that it would not be proper to change from a weighted average rate base to a year-end rate base without also adjusting revenues to reflect new customers.

In the instant case, the commission did not find that the investment which would not increase revenue was extraordinary in comparison to past practice. To the contrary, the commission reasoned that the investment must always be " 'rolled back' " into the test year. The commission reasoned that unless the adjustment was made Pacific would never achieve the reasonable rate of return. This is only true if the increased revenues expected in the future will not be sufficient to offset this investment and other increased investment and expenses. But there is no finding that the anticipated increase in revenues will not offset all of the increased investment and expenses. In the absence of a finding that the investment which would not increase revenue is extraordinary or that the anticipated increase in revenue will not be sufficient to offset all anticipated increases in expenses and investment, there is no basis for adjusting the test year figures.

Under the findings made, we have no way of knowing whether the discretionary investment should be considered large in comparison to prior years when viewed either as to dollars to be spent or in relation to total investment. It may be that in comparison to prior years, the $75 or $80 million figures are not large because similar amounts were spent on discretionary investment in prior years. The $75 and $80 million figures represent approximately 10 percent of the anticipated total of all investments to be made by Pacific in 1970 and 1971, and it may well be that more than 10 percent of the rate base for the test year was based on discretionary investment. If so, it would seem that any adjustments to be made should be made in the direction opposite to that followed by the commission. In any event, any adjustment to be made should be made only for that portion of the investment which may be deemed extraordinary. Since there is no finding that the investment which will not produce increased revenues is extraordinary or that the anticipated increased revenues for future years are insufficient to offset anticipated increased expenses and investment, the findings are insufficient to support the adjustment.

Pacific argues that the adjustment is warranted to offset the effects of inflation. But the two matters are essentially unrelated. Discretionary ex-

penditures may increase or decrease without regard to whether there is inflation or deflation. Moreover, the commission did not rely on the inflation argument.

## RATE OF RETURN

■ The commission fixed the permissible rate of return at 7.85 percent (with 9.5 percent on common equity) which was a substantial increase over the prior rate order. From 1948 to 1954 the authorized rate was 5.6 percent, in 1954 it became 6.25 percent, in 1958 it became 6.75 percent and in 1964 it was reduced to 6.3 percent. (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 643-644.) In 1968, the rate of return was 6.9 percent.

In the last cited case, we concluded that the rate of return there involved was "within the bounds of reasonableness" and would not be disturbed. (62 Cal.2d at p. 656.) The return allowed in the instant case was within the range of the commission's staff recommendation, was only slightly above that urged by petitioner cities, and was within the range of reasonableness. The matters considered by the commission in fixing the rate of return were of the same nature as those considered in the last cited case, and we are satisfied that the commission did not abuse its discretion in fixing the rate of return.

## LICENSING CONTRACT SERVICES

■ Pacific's parent, American, provides certain services such as basic research, assistance in engineering, legal, accounting, financing and other matters for the Bell System operating companies, of which Pacific is one, where these services can be performed more efficiently and effectively on a centralized basis. The amount Pacific pays to American for these services is computed by taking an amount equal to 1 percent of Pacific's gross revenue.

Historically, the commission has rejected the amount computed on the percentage-of-revenue basis when determining Pacific's reasonable expenses for the purpose of setting rates.[9] In lieu of the percentage-of-revenue computation, the commission has used for rate setting purposes the actual costs to American for services rendered to Pacific. The licensing contract

---

[9]The percentage-of-revenue basis of payment was rejected because although over a period of years it might result in average charges that were reasonable, the end result in any particular year at a particular level of rates might not be reasonable. For example, a 10 percent increase in Pacific's rates would result in a 10 percent increase in payments to American for exactly the same services.

expense allowed in the instant case was computed in this manner. However, use of the actual cost figures resulted in a higher allowance than the actual payments made to American.

We pointed out earlier in connection with the discussion of the Western Electric adjustment that in the light of the dominance of the Bell System and its integrated position, the utility enterprise must be viewed as a whole without regard to separate corporate entities. In accordance with this fundamental principle, the commission properly decided to use the actual costs of the services rendered by American rather than the amount paid by Pacific to American.

### LIFELINE SERVICE

■ The "lifeline service" is a basic minimum service which was previously offered at the rate of $2.25 per month with a message allowance of 30 units. This rate was the same, irrespective of whether one or two-party service was used. The service is offered in those areas where residential message rate service is available, with the only restriction being that no more than one such service is allowable per dwelling unit.

Pacific requested that the basic charge for this service be increased to $2.95 and that the 30-message units allowance be reduced to zero. The commission authorized the increase in basic charge to $2.95, but only allowed the message unit allowance to be reduced to 20. This is said to amount to a 52 percent increase in cost to "lifeline" subscribers.[10]

Neither Pacific nor the commission have cited us to any evidence in the record to support this extraordinary increase in cost of the lifeline service,[11] and our review of the record has failed to disclose any such evidence. The extraordinary increase in cost of the lifeline service cannot be sustained on the record before us.

---

[10]Although the increase from $2.25 to $2.95 is 31.1 percent, the *actual cost* should be calculated by not only figuring the increase in the basic rate, but also calculating the *loss in value* of the service, namely the loss of 10 units of the message allowance, or one-third of the lifeline value. On this basis, the actual percentage increase for lifeline users is claimed to be 52 percent.

[11]Pacific cited pages 5575-5577 of the transcript as evidence that the lifeline service requires an initial capital investment of between $25 to $50 per customer. This testimony was in response to the question whether a lifeline system could be established in Sacramento. In cities where such service has already been instituted, the capital investments have already been made and cannot be the basis for requiring an increased rate. No cost statistics were offered by which the commission could determine the reasonableness of the proposed rate increase. In its answer, Pacific asserts that the cost of providing lifeline service greatly exceeds the revenue produced thereby but fails to point to any evidence in the record to sustain this assertion.

## Long Term Construction Plans

The commission ordered Pacific to install $750 million of plant additions for each of the years 1971, 1972, and 1973. The finding supporting this order stated that plant additions of at least $750 million per year by Pacific for the next three years would decrease the likelihood of service problems. This finding was based on evidence in the record which included an analysis of Pacific's 1970 construction expenditures and estimates, as to both size and necessity, and of the construction expenditures anticipated for the next few years. One of the exhibits described in detail the manner in which Pacific arrived at its estimates of future construction expenditures. The commission staff also made their own estimates which closely matched those of Pacific.

Under section 761 of the Public Utilities Code, the commission is authorized after a hearing and a finding that the ". . . practices, equipment, appliances, facilities, or service of any public utility . . . are unjust, unreasonable, unsafe, improper, inadequate, or insufficient, . . ." to order ". . . practices, equipment, appliances, facilities, [or] service, . . ." to be used by the regulated utility. Section 762 of the Public Utilities Code authorizes the commission to order changes after a hearing and finding that ". . . additions, extensions, repairs, or improvements to, or changes in, the existing plant . . . or other physical property of any public utility . . . ought reasonably to be made, or that new structures should be erected, to promote the security or convenience of . . . the public, or in any other way *to secure adequate service or facilities,* . . ." (Italics added.)

It is contended that the instant order was outside the authority of either section 761 or 762 because the sections do not specifically authorize the commission to make a general order to expend a gross dollar amount, rather than ordering construction of a particular facility. The intent of these sections is to allow the commission to insure that the utility can and will provide adequate service. Such a broad intent can support a general order as was issued in the instant case.

Moreover, Pacific concedes that the commission has the power to review the specific expenditures made from this gross amount and to disallow as an expense any which it considered unjustified or wasteful. Such review alone satisfies petitioners' objection to the order.

It is also contended that the order is based on an insufficient finding. The commission's finding that the addition of $750 million per year would decrease the likelihood of service problems is sufficiently specific to satisfy the requirements of section 1705 of the Public Utilities Code.

In addition it is urged that the commission ignored important opposition testimony by a certain witness. The commission did not ignore this testimony. On the contrary, the opinion explained in detail the commission's reasons for rejecting the testimony. When conflicting evidence is presented from which conflicting inferences can be drawn, the commission's findings are final. (*Southern Pac. Co.* v. *Public Utilities Com.*, 41 Cal.2d 354, 362 [260 P.2d 70].)

## ADVERTISING EXPENSES

The commission allowed Pacific to include $11.5 million spent on advertising as an operating expense. The actual advertising expenditures attributable to California were approximately $12.9 million. The commission disallowed $1.4 million on the recommendation of its staff on the ground that there was serious doubt as to whether all the actual advertising expense related to "informative" as opposed to "institutional" advertising.

It is contended that since Pacific is a monopoly with captive consumers, any advertising except that of informing the public of emergency services is calculated to and does no more than create a good public image, and as such is institutional advertising which is not allowable as an operating expense. Advertising which is properly classified as informative results in more than a mere fostering of goodwill. It should result in reductions in operating costs and more efficient service to the ratepayer. The commission could properly conclude that expenditures for such purposes are reasonable operating expenses, and in the absence of a showing that the amount allowed for informative advertising was primarily directed for other purposes, the allowance of the commission must be upheld.

## MISCELLANEOUS CHARGES

After individual consideration of the majority of items affecting the rate proposal, the commission dealt with those which remained under the heading of "Other Miscellaneous Charges." Most of the items in this category involved rate and installation charges for numerous equipment and service functions. All of the items are identified in exhibit 11, section 3, which explains that each such charge is supported by recent cost studies. These cost studies were provided to the commission staff for review and one such study was introduced as evidence.

The commission determined that the rate changes requested merely recognized the ". . . rising costs of the offerings, . . ." and that since most of the proposed rates involved less than a 25 percent increase, they

should be approved.[12] In its findings and conclusions, the commission stated, "[b]ased upon the record herein, the increases in rates and charges authorized herein are justified; the rates and charges authorized herein are reasonable; and the present rates and charges, insofar as they differ from those prescribed herein, are for the future unjust and unreasonable."

It is contended that the commission's finding that these increases were justified and reasonable is inadequate. The finding on which these increases were based not only enumerated the commission's reasons for allowing the increase, but was supported by substantial evidence which was before the commission. The contention is therefore without merit.

### MOTION TO QUASH SERVICE

On March 2, 1971, petitioner Bennett was issued three subpoenas to compel the attendance of Pacific's president and two other corporate officers at public hearings involving telephone rate increases. The return date on the subpoenas was March 17, 1971, at 9:30 a.m. The subpoenas were left with an employee of Pacific, who was designated to accept service of process on the corporation, on March 16, 1971.

The commission held that the subpoenas had not been properly served and ordered them quashed, thus denying petitioners an opportunity to examine the corporate officials. Petitioner Bennett argues that such a holding constitutes a denial of due process of law.

Section 1987 of the Code of Civil Procedure provides that except in the case of a peace officer: "(a) . . . the service of a subpoena is made by delivering a copy . . . to the witness *personally* . . . [or] [¶] (b) In the case . . . of a party . . . or of anyone who is an officer, director, or managing agent of any such party . . . the service of a subpoena upon any such witness is not required if written notice requesting such witness to attend before a court, or at a trial of an issue therein, with the time and place thereof, is served upon the attorney of such party or person. Such notice shall be *served at least 10 days before the time required for attendance* unless the court prescribes a shorter time." (Italics added.)

Petitioner Bennett delayed serving the subpoenas for 14 days until the eve of the return date, and the commission did not abuse its discretion in quashing the subpoenas on the grounds that they had not been properly served.

---

[12]Of the rates included in the miscellaneous list, 72 percent involved increases of 25 percent or less. The other 28 percent (four items) involved increases ranging from 260 percent to 960 percent.

### PROPRIETY OF COMMISSION MEETING

 Following the issuance by the Public Utilities Commission of the instant decision on June 22, 1971, petitioner Bennett requested a rehearing. This initial petition for rehearing was denied on June 29, 1971, and an amended petition for rehearing was filed on July 2, 1971. The amended petition, under provisions of the law, stayed the effective date of the rate increase. On Sunday, July 4, 1971, three of the commissioners came together at an airport near Concord, California, and denied the amended petition. Petitioner Bennett contends that such a meeting was in excess of the commission's jurisdiction.

Section 306 of the Public Utilities Code directs the commission to ". . . meet at such . . . times and in such . . . places as may be expedient and necessary for the proper performance of its duties, . . ." Petitioner has not asserted that Concord, California, was not an expedient meeting place, nor that July 4, 1971, was not a necessary time. Petitioner's innuendos of misconduct, absent specific allegations, are an insufficient basis for review of the meeting's propriety.

### ANNULMENT OF THE COMMISSION'S ORDER

As we have seen, the portions of the commission's decision dealing with the federal and state tax expense, the Western Electric adjustment, and the new "nonrevenue producing" capital expenditures cannot be sustained on the record before us. Although the exact amount of money involved in these portions of the decision is not clear from the record, it is clear from the record that the amount is substantial in relation to the $143 million annual rate increase, and it is possible that the amount involved in the enumerated items is equal to or exceeds the amount of the increase.[13] No basis appears to sever these matters from the increase of rates ordered

---

[13]With respect to the federal and state taxes, the Western Electric adjustment, and to so-called nonrevenue capital expenditures, the relevant figures in the instant case relating to the effect of the departure from accounting principles used in the 1968 rate proceeding are unclear and in some respects conflicting. Nevertheless, some of those figures which seem reliable indicate that more than half of the $143 million increase in the revenue requirement is attributable to the accounting changes which cannot be sustained on the record before us. There is also a strong indication that more than $143 million is accounted for when the amount of revenue increase necessitated by these accounting changes is added to the amount of revenue increase attributable to the change in the rate of return, which in a sense is also an accounting adjustment. In other words, there is reason to believe, although it is not entirely clear, that there have been no substantial changes in the relationship between revenue and expenses since the 1968 rate proceedings involving Pacific, and that none of the rate increase was necessitated by changes in the actual revenue and expenses of Pacific, but that the entire increase may be attributable to the change in the accounting principles and evaluations applied by the commission in determining rates.

by the commission, and it is not claimed that severance is possible. Pacific urges that the increased rates should be continued in effect until the commission establishes a new rate, but there is no basis to continue a rate once it is determined that the rate is invalid. We conclude that the commission's order increasing rates must be annulled in its entirety. This would ordinarily mean that the prior lawfully adopted rate would then go into effect.

On April 4, 1972, the commission by Decision No. 79873 authorized new telephone rates which provided for an increase in rates totalling approximately $70 million annually. This increase includes in it the $143 million increase before us. The April 4 increase was not based on a full scale rate proceeding; rather the commission used the figures and results used in the proceeding before us, using the same test year, and merely adjusted to offset higher operating expenses due to changes in the wages paid, tax law changes, and changes in some other items. On the basis of these changes the commission granted the increase in rates so that the anticipated revenues would produce the rate of return found reasonable in the instant proceeding.

The decision of April 4 is not before us, and although the rates fixed in that proceeding are obviously based in part upon the erroneous determinations in the proceeding before us, we cannot annul in this proceeding the April 4 decision.

Nevertheless, we must recognize that the April 4 rates will supersede the rates in the decision before us, that the errors in the instant proceedings would require annulment of the April 4 decision should it come before us on review unless appropriate action is taken, and that unless this court acts to effectuate our decision the errors we have found will merely be carried forward into future rate increases.

We conclude that to avoid this result this court should order the commission to reinstate the rates of its last lawful order preceding the instant rate proceeding, provided, however, that it may grant interim rate increases upon appropriate findings (see *Saunby* v. *Railroad Commission,* 191 Cal. 226, 230 et seq. [215 P. 904]; Decision No. 42530, 48 Cal.P.U.C. 487, 488; cf. *Dyke Water Co.* v. *Public Utilities Com.,* 56 Cal.2d 105, 110 [14 Cal.Rptr. 310, 363 P.2d 326]), while it considers the propriety of the application for rate increase before us. Such a provision will permit the commission to grant immediate relief to Pacific if appropriate and should prevent the invalid determinations of the commission in the instant proceedings from continuing to affect future rates.

## REFUNDS

At the request of petitioners and with the consent of Pacific, we have previously issued a partial stay providing that all sums collected by Pacific pursuant to the rates authorized by the decision under review shall be subject to refund in whole or in part upon order of this court should the decision or Decision No. 77984 of the commission be annulled or modified.

Petitioners claim that upon annulment of the decision before us the rate increase will be determined to be invalid, that all sums collected in excess of the last lawful rate will have been illegally collected, and that all such sums must be refunded. Pacific urges that this court defer determination of refunds. Pacific's position is that the case should be remanded to the commission to set a new lawful rate in the light of our opinion, and that the refunds should be limited to the difference, if any, between the rates set in the decision before us and the rates set in the further proceedings. Pacific's argument was made in a brief filed before the April 4 decision and it should be pointed out that in the circumstances of this case the rates contemplated by Pacific to be set in further proceedings to determine the amount of refund are artificial rates, and will never go into effect except for the purpose of determining refunds because new rates to be established by the commission for the future will no doubt take into account the matters which led to the April 4 increase in rates. It would obviously be inappropriate to consider such matters in determining the amount of refund in the instant case.

The statutes dealing with stay of commission rate changes pending review by this court do not expressly deal with the question of refunds where there has been a stay and the rate increase is subsequently annulled. The statutes authorizing stays, sections 1762-1764 of the Public Utilities Code, merely provide for the stays and the posting of bonds or the impounding of funds without dealing with the situation before us. In other situations, the Legislature has more clearly spelled out the rights of the parties. Thus, where a commission order *reducing* rates is stayed, or where a commission order denying a rate increase is stayed, and the utility is permitted to charge the proposed higher rates pending review, the statute provides expressly for refunds if the commission order is ultimately affirmed. (Pub. Util. Code, § § 1764, 1766: cf. *Market St. Ry. Co.* v. *Railroad Commission,* 28 Cal.2d 363, 368 [171 P.2d 875].) The absence of any provision for refunds should a commission order be annulled for any reason apparently establishes that no refund will be permitted for annulment of a rate decrease irrespective of the reasons for annulment. The latter situation, the annulment of a rate *decrease,* is of course the converse

of the situation before us, the annulment of a rate *increase,* and this suggests that full refunds are in order where a rate increase is annulled.

We were confronted with a similar question in *Pacific Tel. & Tel.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656. In that case the commission determined that Pacific should reduce its rates by more than $40 million annually. The commission also ordered that Pacific refund to its customers amounts collected from its customers in excess of the new rates during the nearly two years while the rate investigation had been pending before the commission. The amount of the refund ordered was approximately $80 million. Although we affirmed the decision of the commission insofar as it reduced future rates, we annulled the portion of the decision which required the refund. We concluded after an extended review of the relevant statutes that the Legislature had given the commission power to establish rates prospectively and has not given it power to order refunds of amounts collected by a public utility pursuant to an approved order which has become final.

· We pointed out that the fixing of a rate is prospective in its application and legislative in its character, that under section 728 of the Public Utilities Code, as well as other sections of the code, the commission is given power to prescribe rates prospectively only, and that the commission could not, even on grounds of unreasonableness, require refunds of charges fixed by formal finding which had become final. (62 Cal.2d at pp. 650-655.) We recognized that there may be policy arguments for giving power to the commission to order refunds retroactively where rates are found to be unreasonable or to prevent unjust enrichment, but we concluded that such "arguments should be addressed to the Legislature, from whence the commission's authority derives, rather than to this court." (62 Cal.2d at p. 655.) The Legislature has not changed any of the relevant statutory provisions.

We pointed out that the conclusion that the Legislature has not authorized retroactive rate making was supported by section 734 of the Public Utilities Code. (62 Cal.2d at pp. 654-655.) That section provides that when a rate has been formally found reasonable by the commission, the commission shall not order the payment of reparation upon the ground of unreasonableness. Of course, the rates existing prior to the present proceeding have been found reasonable by a final commission decision.

When the rates set in the decision before us are annulled, the only lawful rates are those which were in existence prior to the instant decision. We are satisfied that to permit the commission to fix new rates for the purpose of refunds, as requested by Pacific, would involve retroactive rate making

in violation of the principles recognized in *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656. The basic conclusion that the rates existing prior to this proceeding are unreasonable as well as the conclusion that increases in rates are justified are both based on the same defective findings. To permit the commission to redetermine whether the preexisting rates were unreasonable as of the date of its order and to establish new rates for the purpose of refunds would mean that the commission is establishing rates retroactively rather than prospectively. As we have seen, the Legislature has expressly prohibited the granting of reparations on the basis of unreasonableness, where, as here, there is an approved rate, and the Legislature has authorized only prospective rate making.

Although there may be substantial policy reasons to permit retroactive rate making, there are also substantial reasons to the contrary, and it is for the Legislature to determine whether California should abandon its policy against retroactive rate making.

The adoption of a comprehensive scheme of public utility rate regulation involves numerous considerations, and it has been recognized that absolute equity must sometimes give way to the greater overall good, including the demands of certainty and efficiency. (See *Keco Industries, Inc.* v. *Cincinnati & Suburban Bell Tel. Co.,* 166 Ohio St. 254 [141 N.E.2d 465, 469].) The Ohio Supreme Court in *Keco* rejected the view urged by Pacific that the refunds should be the difference between the invalid rate and the future rates ultimately adopted by the regulatory agency. It pointed out that, although there may not be absolute equity in every circumstance, the Legislature has attempted to keep the equities between consumer and utility in balance and that departures from the absolute equity position based on policy considerations could work in favor of either. This seems reflected by the recent history of the telephone rates in our state. In *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656, we held that the commission, in the light of the rule against retroactive rate making, could not compel Pacific to refund $80 million although we did not dispute the commission's findings that a sum of that magnitude was collected in excess of what would have been a reasonable rate. Today, in furtherance of the same rule, we must compel Pacific to refund a similar or perhaps larger amount.

In the light of the rule against retroactive rate making, it cannot be said on the record before us that inequity will result from a refund of the entire increase of rates collected pursuant to the invalid order. The record does not demonstrate that the increased rates are necessitated by changes since the 1968 rate proceeding in the relationship of revenue and expense

of the utility. To the contrary, there is a strong indication that the entire rate increase is due to changes in accounting principles and accounting evaluations made by the commission.´ (See fn. 13.)´ ▇▇▇ Under the rule against retroactive rate making changes in the rates due to changes in accounting practices and accounting evaluations should only be given effect prospectively after such changes are made on a proper record. ▇▇▇ As pointed out in *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 656, it "is the 'just, reasonable, or sufficient *rates*' (italics added) which section 728 directs the commission to fix after it first finds that 'the rates . . . charged, or collected . . . are unreasonable.'" The accounting changes in the instant case are essential to the finding of unreasonableness.

The cases of *United States* v. *Morgan,* 307 U.S. 183 [83 L.Ed. 1211, 59 S.Ct. 795], and *Atlantic Coast Line* v. *Florida,* 295 U.S. 301 [79 L.Ed. 1451, 55 S.Ct. 713], relied upon by Pacific, are distinguishable. In those cases, the earlier rate which was to be superseded by the administrative agency's invalid rate change was not fixed by the agency and found to be reasonable after hearings as was done in the case before us. We recognized that prior approval of the administrative agency might be a decisive consideration in *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 653, where we distinguished a case on this basis. Moreover, *Morgan* and *Atlantic Coast Line* are of doubtful validity in the light of the later decision in *Chicago, M., St. P. & P. R. Co.* v. *Illinois,* 355 U.S. 300, 302, footnote 2 [2 L.Ed.2d 292, 296, 78 S.Ct. 304], wherein the district court had required that funds due to the rate increase be impounded ·and paid to the ratepayers in the event the administrative order was annulled. Although the United States Supreme Court merely noted and did not discuss the validity of the refund order in its opinion upholding the annulment of the rate increase, the question seems to have been squarely presented on a subsequent application for supersedeas. The court then denied the application without opinion, but a five-page dissenting opinion was filed urging the court to follow *Morgan* and *Atlantic Coast Line.* (356 U.S. 906 at pp. 906-910 [2 L.Ed.2d 573, 574-577, 78 S.Ct. 665].)[14]

---

[14]In *Thermoid Western Co.* v. *Union Pacific ´Railroad Co.,* 12 Utah 2d 256 [365 P.2d 65], like the *Morgan, Atlantic Coast Line,* and *Chicago* cases, the earlier rate which was to be superseded by the invalid rate change was not fixed by the agency after hearings, and thus the case is distinguishable. Moreover, the majority in following *Morgan* and *Atlantic Coast Line* stated that, had the funds from the invalid rate increase been impounded, a different result might have been reached. (365 P.2d at p. 70.) Of course, in the instant case our partial stay was, in effect, an order requiring the increase in rates to be impounded.

The other three state cases cited by Pacific deal with the problem of refunds without any substantial discussion of the problem, and none of the cases cited by Pacific consider in this connection the policy against retroactive rate making.

▇▇▇

We conclude that the entire increase of rates collected pursuant to the invalid order must be refunded. We are informed that the rates approved in the April 4 decision, as amended, went into effect on May 27, 1972. As we have seen, the April 4 increase of rates includes the invalid increase before us, and the latest increase was not based on a full scale rate proceeding but rather merely adjusted the rates before us to offset certain changes in operating expenses. Insofar as the rates which went into effect on May 27 reflect increases based on the invalid order before us, refunds are necessary. However, insofar as the May 27 rates are attributable to the approximately $70 million increase authorized on April 4, they are not subject to refund at this time.

The decision is annulled. The commission is directed to reinstate the rates of its last lawful order preceding the instant rate proceeding provided, however, that it may grant interim rate increases should it find them appropriate while it reconsiders Pacific's application for rate increases. The commission is further directed to order Pacific to make refunds in accordance with the views expressed herein.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., and Schauer, J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur with the majority opinion except for its approval of the commission's authorization for Pacific to include $11.5 million spent on advertising as an operating expense.

By way of introduction I point out that several years ago Pacific attempted to include in operating expenses all the dues it paid to chambers of commerce and the contributions it made to charities. In decision No. 67369 the commission disallowed over half of that amount, observing that "Dues, donations and contributions, if included as an expense for rate-making purposes, become an involutary levy on rate-payers, who, because of the monopolistic nature of utility service, are unable to obtain service from another source and thereby avoid such a levy." The commission then ruled that *all* such expenses would be disallowed in the future, and we held this to be "the correct rule." (*Pacific Tel. & Tel. Co.* v. *Public Util Com.* (1965) 62 Cal.2d 634, 668-669 [44 Cal.Rptr. 1, 401 P.2d 353]; see also *id.* at pp. 676-677 (concurring opn. of Mosk, J.).)

By the same token I believe that in the present proceeding the com-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

mission should have eliminated all of Pacific's claimed advertising costs in its calculation of operating expenses for rate-making purposes. Advertising is generally designed to create goodwill. I submit that the cost of promoting company goodwill should come out of the pockets of stockholders rather than ratepayers. My conclusion in 1965 regarding voluntary contributions applies equally well here: "A dissatisfied stockholder may seek to change the policies of a corporation, defeat the directors, or sell his stock investment. No comparable alternatives are available to a monopoly ratepayer, whose only choice is to pay the full bill sent to him —for services rendered and gifts made in the name of the company—or abandon the use of his telephone." (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* at p. 677 (concurring opn.).)

The advertising of the utility falls into two categories. The first, service informative advertising, according to testimony before the commission, is designed "to inform, advise, instruct and solicit the cooperation of telephone users in making the most efficient use of the telephone. Subjects covered include: direct distance dialing and area codes; directory assistance calls; use and posting of emergency numbers; correction of billing; promotion of goodwill through 'we're here to help' campaign; advice on how to handle malicious, obscene or harassing calls; repair service; buried cable; open house, and public service."

Public instruction which is deemed necessary to proper use of telephone facilities can adequately be provided in the informational pages of the annual telephone directory. By definition, the item for "promotion of goodwill through 'we're here to help' campaign" is calculated merely to foster goodwill. And advice on how to handle obscene telephone calls is properly a function of law enforcement agencies. Thus I would eliminate all the costs attributable to the first category.

The second category, service promotional advertising, according to testimony before the commission, is designed "to stimulate the use of revenue-producing attachments, extensions, etc., or to stimulate long-distance calling." This type of advertising is also suspect.

I find it incongruous that the utility should be encouraged to expend sums for advertising to stimulate the public to make telephone calls at the very time it is seeking substantial funds for new equipment because of the overtaxing of present facilities. Nor can I justify promotion of sales of attachments, extensions and similar devices, many of which are more decorative than functional, as an essential item of operating expense chargeable to ratepayers. Such cost should be added to the charge for the device itself, but not constitute a levy upon ratepayers generally.

In the abstract sense, of course, the judiciary is not well placed to reexamine each and every item of accounting that has heretofore been considered by the staff and members of the regulatory commission. On the other hand, the staff member who testified on the subject of advertising at the commission hearing conceded that "A review was made of the types of advertising used but *no in-depth study was made as to the cost vs. benefits of such advertising.*" (Italics added.) I would refuse consideration of all advertising expenses for rate-making purposes, at least until such time as an appropriate in-depth analysis has been made.

While $11.5 million may not be a substantial percentage of the total operating expenses of this vast public utility, nevertheless it is not a trivial sum when expended by a corporation which operates as a monopoly bearing the imprimatur of the state. It is obviously a highly visible use of the ratepayers' money, and appears to stir up considerable public resentment. The commission's decision itself recognizes that "The item of Pacific's expenses which was subject to the most criticism of public witnesses is advertising." I can only conclude that the commission should have paid greater heed to the sensitivity of the public it is created to serve.

The petitions of respondent Public Utilities Commission and real party in interest for a rehearing were denied July 12, 1972, and the opinion was modified to read as printed above.