373 So.2d 123 (1979)
CENTRAL LOUISIANA ELECTRIC COMPANY, INCORPORATED
v.
LOUISIANA PUBLIC SERVICE COMMISSION et al.
No. 63142.
Supreme Court of Louisiana.
June 25, 1979.
Rehearing Denied August 2, 1979.
Order on Further Consideration October 18, 1979.
*125 William O. Bonin, Landry, Watkins & Bonin, New Iberia, for plaintiff-appellant.
Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Marshall B. Brinkley, Gen. Counsel, L. P. S. C., Baton Rouge, for defendant-appellee.
Stephen M. Irving, Baton Rouge, for intervenor, La. Consumer's League.
DENNIS, Justice.[*]
Central Louisiana Electric Company, Incorporated (CLECO) applied to the Louisiana Public Service Commission (Commission) for an increase in its electric rates.[1] The Commission denied the application.[2] CLECO appealed its case to the district court of the domicile of the Commission, but the district court affirmed the Commission's order. In the instant proceeding the utility exercises its right to a direct appeal to this Court from the judgment of the district court. La.Const. art. 4, § 21(E).
CLECO is a Louisiana corporation domiciled in Rapides Parish. The utility provides electric service to approximately 148,000 customers in a 22-parish area centered in west-central Louisiana. The requested electric rate would have produced $13,827,707.00 in additional annual revenues for the utility. The Commission denied the requested rate increase, finding that the existing rate structure produced adequate revenues for a fair rate of return.

Adjustments Based on Gas Purchases from Subsidiary
In arriving at the figures it used to make the final calculation of CLECO's actual rate of return, the Commission adjusted CLECO's rate base and operating income to attribute to it more than $7,000,000 in revenues *126 earned by Louisiana Intrastate Gas Corporation (LIG). Although the Commission did not seek to exercise jurisdiction over LIG in this case, the agency contends the action was justified because LIG is a wholly owned subsidiary which realized a 45% rate of return on its average book equity in the test year; and its income was derived in substantial part from sales of gas to CLECO. The major issue in this case is whether there is warrant in the record and a rational basis in law for the adjustments, despite the absence of any finding by the Commission that CLECO manipulated its subsidiary or that the price paid LIG for gas was unreasonable.
The facts are not in dispute. Louisiana Intrastate Gas Corporation (LIG), a separate corporate entity wholly owned by CLECO, was incorporated in 1955. Its officers, headquarters and employees are separate and distinct from those of CLECO. Although LIG supplied nearly all of CLECO's fuel in the test year, 66% of LIG's sales of gas and 78% of its pipeline throughput were to non-affiliated industrial and municipal customers. In fact, LIG owns and operates the most extensive intrastate gas pipeline system in Louisiana, serving approximately 62 towns and communities and 51 non-affiliated industrial customers.
Although the Commission has the power to disallow as an operating expense amounts paid by the utility which are "unjust or unreasonable and designed for the purpose of concealing, abstracting or dissipating the net earnings of the public utility," La.R.S. 45:1176, the Commission in the instant case did not determine that the prices paid by CLECO to its subsidiary for gas were unjust or unreasonable. Indeed, the evidence of record indicates that the prices were fair, reasonable and comparable to the prices which LIG charges its other non-affiliated customers in arm's length transactions. Of LIG's 52 industrial customers CLECO's price for boiler fuel ranked 40th when prices were arranged in descending order. Moreover, the price charged CLECO for boiler fuel was identical to the price charged two of LIG's non-affiliated electric utility customers.
The Commission contends that it has not attempted to regulate the price of gas sold by LIG in the present case. In its order the Commission declared that it is "obligated to insure that the earnings on investment in LIG used to produce fuel for CLECO are not improperly excessive," p. 3, and that it "must insure that these fuel costs generate no more than a fair profit." p. 4. In furtherance of these perceived duties, the Commission concluded that "[t]o insure that the rate payers of CLECO are treated fairly, the Commission will allow CLECO and LIG to earn only the fair rate of return on the investment in LIG used to produce fuel for CLECO." p. 4. To effectuate this policy the Commission made regulatory adjustments by, first, determining the ratio that LIG's sales to CLECO bear to LIG's total sales and, second, by including this percentage of CLECO's investment in LIG in CLECO's rate base; and by including the same percentage of LIG's income from gas sales in CLECO's operating income. The adjustments resulted in additions of $8,160,000 to CLECO's rate base and $4,739,000 to its operating income. CLECO contends that but for these adjustments the Commission would have been required to grant it a rate increase to provide $7,281,000 in additional annual revenue.
Manipulation by a parent utility of a subsidiary for the purpose of creating excessive profits at the expense of the rate payer would provide a reason for the regulatory agency to disregard corporate entity and attribute subsidiary assets and earnings to the parent. See, City of Los Angeles v. California Public Utilities Comm'n., 94 PUR 3d 226, 7 Cal.3d 331, 102 Cal.Rptr. 313, 497 P.2d 785 (1972); Illinois Bell Telephone Co. v. Illinois Commerce Comm'n., 3 PUR 4th 36, 55 Ill.2d 461, 303 N.E.2d 364 (1973); Washington Water Power Co. v. Washington Utilities & Transportation Comm'n., ___ PUR 4th ___, No. 59791 (Wash. Superior Ct., Nov. 2, 1978).
In the present case, however, there is no evidence that the subsidiary corporation has been used as a mere instrumentality or *127 adjunct for such a purpose. LIG was organized as a gas pipeline company in 1955 for the purpose of assuring CLECO an adequate supply of natural gas. However, because of CLECO's limited fuel requirements, LIG was required to develop additional customers who have no affiliation with CLECO in order to sustain an operation of sufficient size to have competitive gas purchasing power. As noted, LIG's separate management has developed Louisiana's most extensive intrastate pipeline and relies on CLECO as a market for only 34% of its gas sales and 22% of its pipeline throughput. The Commission does not question the wisdom or legitimate motives of CLECO in organizing a separate corporation for the purpose of developing a dependable source of fuel. In short, LIG seems to have acquired a vigorous and somewhat independent corporate character, and if the subsidiary receives substantial profits for its gas, the record in this case suggests that it is probably due to the energy crisis and not by the design or manipulation of CLECO.
Unreasonably high charges by a subsidiary for its products or services, even if provided for by legally enforceable contract, may afford a rational basis for adjustments by the agency in the rate making process. Clearly, as mentioned above, the Commission has the power to disallow any unreasonable or unjust operating expense paid by a parent utility in fixing rates. La.R.S. 45:1176. Before the regulatory body can make this type of adjustment, however, there must be warrant in the record of the rate case for a factual finding, or at least a reasonable inference, that the charges or expenses, are in fact unreasonable. In the instant case the Commission failed to find that the prices were unreasonable when compared with LIG's prices charged non-affiliated utilities or with prices charged by independent suppliers; and the evidence would not have supported such a finding.
Notwithstanding the absence of manipulation or payment of unreasonable gas prices by CLECO, the Commission argues that its action was justified simply because LIG is a wholly owned subsidiary which profited substantially from the sale of gas to its parent and earned approximately 45% on its average book equity during the test year.
CLECO contends that, although its rate of return is lower than LIG's, the Commission has erroneously overstated LIG's actual return and wrongly assumed that it exceeded LIG's fair rate of return. Moreover, CLECO contends that under the circumstances of this case the subsidiary's earnings or return should not in any way be attributed to the parent corporation.
The power of a public service commission to inquire into contracts between the company furnishing the service or commodity, the rates for which are under inquiry, and its corporate affiliate has been the subject of judicial inquiry in a number of cases. Although there is general agreement that the commission has power to inquire into the reasonableness of such contracts, the courts differ widely as to the findings required before the commission may disallow an expense or make other adjustments.
Several judicial opinions have favored a narrow scope of inquiry by the regulatory agency. In these cases the courts have said that a commission cannot ignore an operating expense unless there is an abuse of discretion in that regard by the corporate officers; Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923); that common ownership is not of itself sufficient ground for disregarding intercorporate agreements when it appears that, although an affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from the contract and probably could not have secured better terms elsewhere. United Fuel Gas Co. v. Railroad Commission of Kentucky, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390 (1929); and that a commission, operating under a state statute similar to La.R.S. 45:1176, could have disallowed an excessive price paid by a utility to its subsidiary, but the evidence would not *128 support a finding of excessiveness where a commodity was purchased at its fair market value, and under no circumstances could the commission apportion a part of the subsidiary's profits to the parent utility. Re Montana-Dakota Utilities Co., N.D., 102 N.W.2d 329, 33 PUR 3d 531 (1960). However, such a limited ambit of inquiry is incongruous with the Louisiana Commission's broad constitutional power and authority to supervise, govern, regulate and control all common carriers and public utilities. La.Const. art. 4, § 21; cf. City of Plaquemine v. Louisiana Public Service Commission, 282 So.2d 440 (La.1974).
The Commission relies on a line of cases in which courts and regulatory agencies concluded that expense payments to affiliates of a regulated utility should not produce a profit in excess of its parent's fair rate of return. Illinois Bell Telephone Co. v. Illinois Commerce Comm'n., 3 PUR 4th 36, 50, 55 Ill.2d 461, 303 N.E.2d 364 (1973); City of Los Angeles v. California Public Utilities Comm'n., 94 PUR 3d 226, 236, 7 Cal.3d 331, 344, 102 Cal.Rptr. 313, 497 P.2d 785 (1972); Pacific Northwest Bell Telephone Co. v. Sabin, 8 PUR 4th 159 (Or.Ct. App.1975); Re New England Telephone & Telegraph Co., 13 PUR 4th 65 (Me.Pub.Util. Comm'n., 1976); Re New England Telephone & Telegraph Co., 10 PUR 4th 132 (R.I.Pub.Util.Comm'n., 1975); Re The New York Telephone Co., 7 PUR 4th 496 (N.Y. Pub.Serv.Comm'n., 1974); Re General Telephone Co. of Illinois, 6 PUR 4th 90 (Ill.Commerce Comm'n., 1974); Re Michigan Bell Telephone Co., 3 PUR 4th 1 (Mich.Pub.Serv. Comm'n., 1973); Re New York Telephone Co., 2 PUR 4th 1, 10-12 (N.Y.Pub.Serv. Comm'n., 1973); Re The Pacific Telephone & Telegraph Co., 95 PUR 3d 1 (Cal.Pub. Util.Comm'n., 1972). However, all of the cases cited by the Commission involve telephone companies and are clearly distinguishable.
The majority of cases cited by the Commission involve the Bell System and Western Electric, a wholly owned subsidiary which manufactures and supplies telephone equipment. In these cases the rate making body pursued a policy of adjusting the prices Western Electric actually charges its Bell affiliate to reflect no greater rate of return than would be reasonable for the regulated utility. But see, Re Northwestern Bell Telephone Co., 8 PUR 4th 75 (Minn.Pub.Serv.Comm'n., 1974). To allow a higher rate of return is considered by these jurisdictions as imposing on Bell's rate payers the burden of providing to the parent company, American Telephone & Telegraph, excessive returns on sales by Western to Bell. See, Illinois Bell Telephone Co. v. Illinois Commerce Commission, 3 PUR 4th 36, 50, 55 Ill.2d 461, 303 N.E.2d 364 (1973).
This policy may be justified in light of the corporate structure of American Telephone & Telegraph, but the intercorporate relationship of CLECO and LIG does not warrant such an inflexible treatment. In the telephone cases, it was recognized that Western Electric has a unique relationship in the Bell System. Excluding government business, approximately 98% of Western Electric's total sales are made to AT&T and Western Electric virtually monopolizes the market for equipment used by the Bell System. The integrated nature and unified control of this structure effectively immunizes any transaction between Western Electric and the Bell System operations from competitive market prices and renders a comparison of its prices and profits with other manufacturers inadequate. Re New England Telephone and Telegraph, 10 PUR 4th 132 (R.I.Pub.Util.Comm'n., 1975).
These unique elements are not present in the CLECO-LIG relationship. LIG and CLECO carry on different types of enterprises with separate control and a minimum of integration. 66% of LIG's total sales are made to non-affiliated purchasers at prices comparable to those charged CLECO. Since LIG does not hold a monopoly on the sale of natural gas, it is possible to realistically determine just and reasonable prices for natural gas in its competitive market. CLECO introduced undisputed evidence that the prices it paid to LIG for boiler fuel were reasonable in comparison with prices charged other LIG customers. Accordingly, *129 the telephone company cases based upon the relationship between AT&T and its totally dominated and integrated subsidiary, Western Electric, are distinguishable and not controlling in the instant proceedings.
We conclude that the Commission has the power and authority to investigate and make adjustments to assure that the utility's stockholders, through the subsidiary company, do not receive a greater return than warranted upon sales made to the utility and costs passed along to the rate payer. However, in a case such as the instant proceeding, in which the subsidiary's operations are not closely integrated in those of the parent but include substantial dealings with non-affiliated customers, and in which the subsidiary encounters business risks markedly different from its parent's, the fair rate of return of the subsidiary and not that of the parent should be the touchstone for determining if the subsidiary's profits are unreasonable and for making any indicated adjustments. Of course, in a case involving a wholly owned subsidiary, the Commission's inquiry is not concluded by the fact that comparable prices are charged by the affiliate to other utilities, or by comparable rates charged by independent suppliers. The Commission's proper concern is not the level of price at which the inter-affiliate transaction is accomplished in comparison with prices in non-affiliated transactions, but instead whether there is a level of earnings by the wholly owned subsidiary at a rate higher than the subsidiary's fair rate of return. See generally, Western Distributing Co. v. Public Service Commission of Kansas, 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655 (1932); Mississippi River Fuel Corp. v. Federal Power Commission, 102 U.S.App.D.C. 238, 252 F.2d 619 (1957); Washington Util. and Transp. Comm'n. v. Wash. Water Power Co., 24 PUR 4th, 427, reversed, ___ PUR 4th ___, No. 59791 (Wash.Super.Ct. Nov. 2, 1978); Wichita Gas Co. v. Public Service Commission, 2 F.Supp. 792 (D.C.Kan.1933).
Turning to the record of the instant case before the Public Service Commission we find that the Commission made no determination of the fair rate of return of LIG. In fact, we cannot find in the record any financial, cost and risk data which would warrant the determination that LIG's test year rate of return was excessively unreasonable. Indeed, even the finding that LIG earned approximately 45% on its average book equity during the test year was supported only by the conclusory and sketchy testimony of a single witness. The Commission's adjustments to CLECO's rate base and operating income, therefore, were neither warranted by this record nor founded upon a rational basis in law.
Accordingly, we must remand the case to permit the Commission, if it desires, to inquire into the fair rate of return of LIG during the test year and to make adjustments based thereon if indicated by the additional evidence to be presented by the parties.

Working Capital
The primary purpose of the rate making process is to set rates at such a level that the utility's revenue will be sufficient to permit the utility both to pay its legitimate operating expenses and to provide a return on investment adequate to compensate existing investors and attract new capital as it is required. The total amount of investment in a utility employed in providing its service, the utility's rate base, is determined by adding the investment in physical properties to an allowance for working capital. See, South Central Tel. Co. v. Louisiana Public Service Commission, 352 So.2d 964, 968 (La.1977) and authorities cited.
Because a utility enterprise, like a grocery store, cannot be operated without continuously available cash, an allowance for cash working capital to purchase materials and supplies has been added to the rate base as a matter of course throughout the history of regulation. However, in recent times regulatory agencies have come to recognize the need for more critical examination in making a working capital allowance in order to determine the amount of working cash that is actually necessary and whether this amount will be provided by *130 investors or is being supplied by customers and other non-investors. See, 1 A. Priest, Principles of Public Utility Regulation, 183 (1969). One pronouncement of the more modern view by the Pennsylvania Supreme Court has been widely quoted:
"Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor. ... It can readily be seen that initially, at the commencement of operation, capital supplied by investors must, in order that the Company can function, include such working cash in addition to the amount required for physical plant and facilities. ... Almost invariably, however, its allowance has been determined by the actual necessity therefor existent when disputed rates of an established and going concern are before the Commission. ...
"To the extent that the customers are providing revenues before the utility pays its costs, the investors are not supplying the funds to carry on .... If the financial situation of an operating company shows that sufficient funds are readily available to bridge the gap between rendition of and payment for services, no cash working capital is required and none should be allowed by the Commission." Pittsburgh v. Pennsylvania Pub. Util. Comm'n., 370 Pa. 305, 309, 88 A.2d 59, 61-62 (1952).
One of the tools that may be employed by a regulatory agency in making a cash working capital allowance is the lead-lag study. Just as there is a lag period between the time customers are billed and the time payment is made, so also there is a lag between the time operating and maintenance expenses are incurred by the company and the time the company pays its bill. A lead-lag study reflects the lag in the number of days for payment of operating expenses and uses this as an offset to the lag experienced by the company in receiving revenue from its customers. See, e. g., Pa. Public Utility Co. v. Quaker State Telephone Co., 26 PUR 4th 20 (1978).
In the instant case CLECO, at the insistence of the Commission, performed a lead-lag study. The results of the study were generally accepted by the Commission, but upon the recommendation of its expert, Mr. Louiselle, the Commission made two significant adjustments of the utility's figures. The company contends that these adjustments were arbitrary and unreasonable and for its proof relies upon the testimony of its expert, Mr. Peterson. Resolution of the controversies depends, therefore, upon the testimony of these experts which, unfortunately, is sketchy.
In its first adjustment the Commission eliminated depreciation expense from the lead-lag study. Although the testimony is not clear, it appears that the company's expert contended that this item should have been included to compensate for the lag in collection of revenues needed for the replacement of fully depreciated assets. However, the Commission's expert pointed out that depreciation expense does not represent a cash expenditure and that the company's study included no offsetting entry for the lag between the time a depreciated asset is replaced and the time the company pays for it. He testified that if components were included properly reflecting lags with respect to depreciation and interest the cash working capital would be smaller than that allowed by the Commission.
Based on the evidence in the record, the Commission's determination appears to be reasonable. As we understand the company's contention, it does not complain that the Commission disregarded any depreciation expense in determining the company's operating expenses. Thus, we assume that the company's annual depreciation expenses were fully considered in setting rates at a level which would enable the utility to pay all of its operating expenses, including depreciation. The company argues, instead, that depreciation expenses should be considered a second time in the lead-lag study because the company will experience a delay in the replacement of depreciated assets due to a lag in its collection of revenues. The record does not demonstrate, *131 however, that the replacement of depreciated assets is tied to the collection of any particular revenues or that any lag in the collection of revenues was omitted from the lead-lag study. Accordingly, if all of the company's lags in collecting and paying out revenues have been considered, it is difficult to understand why the company should be entitled to additional working capital allowance because of depreciation. Moreover, if depreciation expense could be included logically within the lead-lag study, the Commission's expert, Mr. Louiselle, gave cogent reasons, which were not refuted by the utility's evidence, why the company's depreciation data was incomplete and did not require the Commission to make a greater cash working capital allowance.
The second adjustment made by the Commission to the lead-lag study concerned the company's inclusion of fuel cost adjustment lag in the working capital requirement. Mr. Louiselle, the Commission's expert, explained the adjustment as follows:
"The second difference between Mr. Peterson [CLECO's expert] and myself concerns the lag on the collection of fuel clause revenues. Mr. Peterson assumes that those fuel costs recovered through the fuel clause are not collected for a total of some 102 days. This reflects the average revenue lag and the two month fuel adjustment clause lag. This item is in essence what is normally called deferred fuel costs. Under deferred fuel cost accounting, the difference between the cost of fuel in a month and the fuel costs recovered in that month are deferred.
"I made an analysis of CLECO's fuel costs for 1976. Since my analysis indicates that CLECO did not have an earnings deficiency, CLECO recovered its total costs including the cost of fuel. While CLECO has recovered the total cost of fuel in 1976, given its level of earnings, these data provide an indication of what amount of fuel costs would not be recovered were similar increases in fuel costs to occur in the future.
"The analysis I made was to compute what the year end balance of deferred fuel costs would have been had CLECO practiced deferred fuel cost accounting. This study indicated a year end balance of approximately $1.5 million on a Louisiana retail basis and an average year amount of approximately $750,000. I will include $750,000 as a separate component of working capital. This amount provides reasonable protection for the possibility that actual fuel costs will not be recovered in the future due to the two month fuel adjustment clause lag."
In an attempt to rebut the Commission's case for the adjustment Mr. Peterson, CLECO's expert, testified:
"Q. Mr. Peterson, is recovery of fuel expense the only aspect of fuel utilization to be considered in a cost of service analysis?
"A. No. Even on a simplified basis, fuel utilization involves operating revenues, operating expenses, return, and rate base. Recovery of the O & M expense for fuel is only one consideration. Other considerations include determination of proper fuel inventory levels, payment schedules for fuel purchases, and the billing and collection cycles for the related service rendered. As established in the Working Capital Analysis as filed, collections under the fuel adjustment clauses as currently approved are distinct from base rate collections, and additional working capital is necessary due to the delay between expense incurrence and related collection.
"Mr. Louiselle's assumption of a deferred fuel cost accounting practice that is not in fact practiced by the Company, and his very incomplete fuel utilization analysis invalidates his working capital conclusions."
The foregoing is all the explanatory testimony contained in the record pertaining to the fuel cost adjustment. The record leaves much to be desired by one who has no expertise in the field.
As we understand the evidence, the utility argues that although only a brief delay was involved in the recovery of the "base" fuel rate, there was an additional two months delay in the recovery of fuel cost *132 adjustments. Mr. Louiselle acknowledged that there was an additional recurring two-month lag in the collection of revenues attributable to the fuel adjustment clause. However, rather than allow the full amount claimed by CLECO, the Commission accepted Mr. Louiselle's recommendation and included only the amount which was equal to the year end balance of deferred fuel costs which would have resulted had CLECO practiced deferred fuel cost accounting.
CLECO complains that this adjustment was unreasonable because, among other reasons, it does not practice deferred fuel cost accounting. This complaint has merit. The Commission has failed to show either in its evidence or its opinion why the actual accounting practice of the utility should be disregarded. There is no explanation of how deferred fuel cost accounting differs from the company's practice or why it is fair or more accurate from a regulatory standpoint. Accordingly, under the circumstances presented by the record herein, we find that the Commission's actions were unsupported by the evidence.

Other Specifications of Error
We have reviewed the other specifications of error filed by CLECO and find them to be without merit. The district court's affirmance of the Commission's order, with respect to the remaining issues was correctly based on well-settled principles of law expressed in the lower court opinion.[3]

Decree
For the reasons assigned, the judgment of the district court is reversed, the order of the Commission is vacated and set aside, and the case is remanded to the Public Service Commission for further proceedings.
REVERSED AND REMANDED.

ON APPLICATION FOR REHEARING
PER CURIAM.
Both appellant and appellee applied for rehearing. The applications are denied.
Our original opinion and decree are amended, however, to provide that the case shall be remanded to the public service commission to permit it to inquire into the fair rate of return of LIG during the test year and to make adjustments based thereon as indicated by the additional evidence to be presented by the parties; and to permit the parties to introduce additional evidence on the computation of working capital by the Commission. Furthermore, the determinations on these issues by the Commission shall be made within sixty days from this decision on the applications for rehearings, and this Court will retain jurisdiction of this matter under our supervisory jurisdiction for expeditious review; if the Company is dissatisfied with the Commission's decision on remand, it may by motion filed in this Court within fifteen days following the Commission's action bring the matter before us for further consideration.
REHEARING DENIED; OPINION AND DECREE AMENDED.

ORDER
It is ordered that this matter be brought before this Court for further consideration and that the entire record in this case, including that compiled by the Louisiana Public Service Commission on remand, be filed with the Clerk of this Court at the earliest possible date. Oral argument not contemplated. Movant to file brief within 15 days after transcript is lodged. Opponent shall have 30 days from lodging of transcript to file brief.
NOTES
[*] Judge Pike Hall, Jr., Louisiana Court of Appeal, Second Circuit, participated in this decision as an Associate Justice Ad Hoc.
[1] The Louisiana Consumer League, Incorporated was permitted to intervene in the instant proceeding pursuant to an order by this Court. Louisiana Consumer League, Inc. v. Louisiana Public Service Commission, 351 So.2d 128 (La. 1977).
[2] CLECO also applied for an increase in its gas rates. The Commission's denial of the gas rate application was affirmed by the district court, and CLECO appealed. However, the parties have informed the court that the appeal in the gas case has been rendered moot by a subsequent rate increase granted by the Commission.
[3] The district court's opinion made no mention of the company's charges that certain members of the Commission should be recused for bias. These charges border on being frivolous and do not deserve an extended answer. The company alleges only that some of the Commissioners have preconceived views about law or policy, not that they have attitudes of favoritism or animosity toward a particular party. Bias in the sense of crystallized point of view about issues of law or policy is almost universally deemed no ground for disqualification. See, K. Davis, Administrative Law Text, §§ 12.01-12.06 (3d ed. 1972).