668 P.2d 1007

The **WASHINGTON WATER POWER COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

**No. 14462.**

Supreme Court of Idaho.

Aug. 24, 1983.

Paul D. McCabe, Coeur d'Alene, Robert L. Simpson and David J. Meyer, of Paine, Lowe, Coffin, Hamblen & Brooke, Spokane, for appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Patricia Clark Tompkins, Deputy Atty. Gen., Boise, for respondent.

HUNTLEY, Justice.

The issue presented by this appeal was first addressed by this court in *Washington Water Power v. Idaho Public Utilities Commission,* 101 Idaho 567, 617 P.2d 1242 (1980) (hereinafter referred to as *WWP I*). As that opinion contains a complete statement of the facts relevant to this appeal, we will not recite them again here. The primary issue in *WWP I* was whether the Commission erred in concluding that Washington Water Power Company (WWP) had failed to carry its burden of proving the reasonableness of its costs for coal it purchased from its wholly-owned subsidiary, Washington Irrigation and Development Company (WIDCo). We held that the Public Utilities Commission (the Commission) had failed to set out sufficient support for the conclusions it reached regarding its treatment of the coal supply expenses from WIDCo. Accordingly, the Commission's rate-setting order (No. 13856) was set aside. *Id* at 579, 617 P.2d at 1254. We are now faced with the same issue, raised in the context of the October 20, 1981, rate-setting order (No. 16829) in which the Commission again held that WWP had failed to sustain its burden of proof that the price it paid for coal from its subsidiary was just and reasonable. We are presented with the additional issue of whether the Commission's adoption of the "California approach" as a means of dealing with the WIDCo/WWP coal supply arrangement is arbitrary or unreasonable.

## I.

In *WWP I* this court discussed at some length the problem of determining the "reasonableness" of operating costs incurred by a utility in transactions with an affiliated company. We noted that determination of the reasonableness of payments to an affiliate involved many complex issues which are best left for the Commission to deal with, and that the function of this court is limited to a review of that determination. This court quoted with approval from *State v. Public Service Commission,* 537 S.W.2d 655 (Mo.App.1976):

" 'If the commission has the power and duty to inquire into the reasonableness of the transactions in question, the commission, as the repository of the legislative rate-making power entrusted to it, has the right to determine a reasonable standard of judgment consistent with statutory and constitutional limitations. The limited authority of a court upon judicial review of the commission's action does not encompass a substitution by the reviewing judicial authority of its judgment for that of the commission.' *Id* at 664" 101 Idaho at 575, 617 P.2d at 1250.

This court cited several cases affirming a public utility commission's authority to adopt its own standard for determining reasonableness of expenses in transactions between utilities and their affiliates so long as that standard is reasonable and does not deprive the utility of a fair rate of return. 101 Idaho at 574, 617 P.2d at 1249. *See, e.g., Pacific Northwest Bell Telephone Co. v. Sabin,* 21 Or.App. 200, 534 P.2d 984, 996 (1975); *Application of Montana-Dakota Utilities Co.,* 278 N.W.2d 189, 191 (S.D. 1979).

In *Boise Water Corp. v. Idaho Public Utilities Comm'n,* 97 Idaho 832, 555 P.2d 163 (1976), this court held that the utility company had the burden of proving reasonableness of its operating expenses paid to an affiliate, and "[t]he Commission had discretion to rule that it was not persuaded by the Company's evidence that these charges were reasonable." *Id.* at 838, 555 P.2d at 169. In the instant case WWP

had the burden of proving that the expenses which it incurred through purchasing coal from its wholly-owned subsidiary were just and reasonable. The Commission held that WWP did not carry its burden of proof. This court's task is to determine whether the Commission's ruling is supported by "adequate findings of fact based upon competent and substantial evidence." *Washington Water Power v. Idaho Public Utilities Comm'n,* 101 Idaho at 575, 617 P.2d at 1250.

To meet its burden of proving the reasonableness of its coal expenses, WWP introduced evidence intended to show "arm's-length bargaining" between WIDCo and WWP. The coal supply agreement was not solely between WWP and its subsidiary, WIDCo. The agreement was between WIDCo and Pacific Power and Light Company (PP&L) as joint owners of the coal reserves (sellers) and the eight owners of the Centralia power plant (purchasers). It was determined that the two "majority owners" of the Centralia plant, PP&L (47½%) and WWP (15%), would be excluded from having a vote on base price changes, and that the six "minority owners" (none of whose interest exceeded 8%) would have certain specific rights in the event an agreement on a reasonable coal price was not reached. If an agreement could not be reached, the minority owners could submit the matter to arbitration, and they were free to secure bids from some entity other than WIDCo to operate the mine.

While it is correct that evidence of arm's-length bargaining will help establish the reasonableness of the price paid for coal, that evidence alone will not establish reasonableness, where, as in this case, the supply agreement partakes of an affiliated transaction. In such a transaction there arises the potential for two separate threats to a reasonable price: collusion and inhibited competition. In *Boise Water, supra,* 97 Idaho at 838, 555 P.2d at 169, we stated:

> "The reason for the distinction between affiliate and non-affiliate expenditures appears to be that the probability of unwarranted expenditures corresponds to the probability of collusion. In dealing with non-affiliates *the pressures of a competitive market and the fact of arm's-length bargaining* for goods and services allows us to assume, in absence of a showing to the contrary, that such operating expenses are legitimate." (Some emphasis added.)

In addition to arm's-length bargaining, we noted the role of a competitive market in influencing the reasonableness of prices paid. It is the Commission's position that the presence of arm's-length bargaining in the WIDCo coal pricing agreements was irrelevant because there was insufficient evidence of a competitive market. The Commission in its findings draws attention to several factors which it found created a non-competitive market: (1) the price of coal sold by WIDCo was set in a long-term contract under which the owners of the Centralia plant agreed to purchase *all of their coal requirements* from the WIDCo-operated mine through the year 2006; (2) the contract provides for automatic increases as WIDCo's expenses increase, and WIDCo can at any time give six month's notice of an intent to increase the price for any other reasons; (3) the nearest alternative coal supplier is Westmoreland Resources, Inc., a coal mining company located in Southeastern Montana, and the price of Westmoreland coal, delivered to Centralia, would be $33.40 per ton as compared with WIDCo's price of $14.86 per ton; and, (4) the Centralia plant is located at the very "mouth" of WIDCo's coal mine. In addition, the record shows that the Centralia plant was specifically designed to burn coal from WIDCo's and PP&L's coal reserves. To burn other coal, WWP witness Richard McCarthy testified, might require modification of Centralia's boilers.

We have reviewed the record and cannot say that the Commission has acted arbitrarily or abused its discretion in holding that WWP's proof of arm's-length negotiations was not controlling on the issue of reasonableness of price.

## II.

We now consider whether the Commission's adoption of the "California approach" for dealing with the WWP/WIDCo coal supply relationship was arbitrary or unreasonable. We hold that it was. The "California approach," and its counterpart the "traditional approach," were discussed by this court in *WWP I,* 101 Idaho at 573–74, 576, 617 P.2d at 1248–49, 1251.

█ In brief, the California approach allows a utility to include in its rate base only those expenses it incurs in dealing with a subsidiary which would give the subsidiary a rate of return equal to the parent utility's, and no higher. In other words, where the subsidiary is a related part of the parent utility's operation, it is presumed under this approach to be entitled to no higher return on its capital than the fair rate of return of the parent utility. In *WWP I* we noted that the "theory underlying this approach is that where a utility enjoys an integrated position and market dominance, it 'should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activities.'" 101 Idaho at 573, 617 P.2d at 1248.

At the foundation of this approach is the concept of "integration." It is thought that to the extent that a subsidiary and its parent utility are "vertically integrated," that is, closely connected in the unified utility function, and interdependent, the subsidiary ought to be limited to the authorized rate of return for the utility itself.[1] In that sense, the California approach is not so much a means to measure reasonableness of affiliate pricing as it is a presumption that any price which allows the affiliate a higher rate of return than the utility is per se "unreasonable." *WWP I, supra,* 101 Idaho at 573, 617 P.2d at 1248.

WWP contends such an approach is inflexible and thus unreasonable and unfair. We cannot conclude that it is at all times inappropriate, however, to treat a wholly-owned subsidiary as simply a part of the utility. Where an electrical utility has created a separate corporate identity for its wholly-owned coal supply operation, and where that subsidiary continues as an integrated part of the unified production and distribution function of the utility, it would not be unreasonable or arbitrary for the Commission to combine the subsidiary's rate base, income and expenses with those of the utility for rate-making purposes. At the root of the determination to treat the subsidiary the same as the utility is the recognition that (1) in some cases the separation is in name only, and (2) the unique position of the subsidiary coal supplier, having as it does an assured market for its coal, limited risk and a non-competitive environment, makes price comparisons with other coal companies of limited value in determining "reasonableness," and that in the absence of some showing of outside factors which would make the subsidiary operate at a greater risk than the utility, the Commission might be justified in assuming the utility's fair rate of return is fair for the subsidiary also.

The Commission compares WIDCo with several other utility-owned coal operations which are integrated in the utilities' extraction-production-distribution process. In its rate-setting order the Commission states:

"We note that our treatment of WIDCo is consistent with that accorded the coal operations of other utilities in a variety of regulatory contexts, PP&L owns its share of these coal fields directly, rather than through a subsidiary; regulatory bodies having jurisdiction over PP & L recognize this investment as a part of that utility's investment in the Centralia plant. In like manner, Idaho Power Company owns coal reserves (adjacent to the Jim Bridger coal-fired stream plant in Wyoming) through a subsidiary, Idaho Energy Resources Company (IERCo). This Commission, since 1976, has been treating IERCo as an integral part of

1. For references dealing with the concept of "vertical integration" see Note, Treatment of Affiliated Transactions in Utility Rate Making: Western Electric Company and the Bell System, 56 Boston U.L.Rev. 558, 576–577 (1976).

Idaho Power Company's investment in the steam plant. Idaho Power Company has accepted this procedure. Finally, Utah Power & Light Company (UP&L) owns coal mines directly which provide fuel for that company's coal-fired steam plants. These mines are included as utility plant by the regulatory bodies having jurisdiction over UP&L. Other than the existence of separate corporate identities for WIDCo and IERCo, the basic purpose of all these coal operations is identically the same, namely, to provide fuel to the steam plants of the parent utility. It is clear, therefore, that use of the 'California approach' with respect to WWP's subsidiary, WIDCo, is not a departure from typical rate-making treatment accorded such coal operations by regulatory bodies."

The question we now must consider is whether the WIDCo operation is characterized by such significant vertical integration as to justify its being held to a rate of return no greater than that of WWP. While it is true, as the Commission points out in its rate-setting order, that WIDCo is in many respects similar to other wholly-owned coal operations which are treated as part of their parent utilities, there are several notable differences.

In the WIDCo/WWP pricing relationship there is involvement of several other "non-affiliated" utility companies. WIDCo does not supply coal exclusively to its parent utility, but rather supplies to a plant owned by eight independent entities, each of which has its own interest in keeping coal supply expenses as low as possible. In this sense, WIDCo is similar, although in a lesser degree, to the subsidiary gas supplier in *Central Louisiana Electric Co. v. Louisiana Public Service Comm'n*, 373 So.2d 123 (La. 1979). At issue in that case was the reasonableness of prices charged to the regulated electric utility by its subsidiary for natural gas. The court stated:

"However, in a case such as the instant proceeding in which the subsidiary's operations are not closely integrated in those of the parent, but include substantial dealings with non-affiliated customers, and in which the subsidiary encounters business risks markedly different from its parent's *the fair rate of return of the subsidiary and not that of the parent should be the touchstone for determining if the subsidiary's profits are unreasonable and for making any indicated adjustments.* Of course, in a case involving a wholly owned subsidiary, the Commission's inquiry is not concluded by the fact that comparable prices are charged by the affiliate to other utilities, or by comparable rates charged by independent suppliers. The Commission's proper concern is not the level of price at which the inter-affiliate transaction is accomplished in comparison with prices in non-affiliate transactions, but instead *whether there is a level of earnings by the wholly owned subsidiary at a rate higher than the subsidiary's fair rate of return.* (Emphasis added.) 373 So.2d at 129.

The court then remanded the case to the public service commission for it to inquire into the fair rate of return of the subsidiary. *Accord, Montana-Dakota Utilities Co. v. Bollinger,* 632 P.2d 1086 (Mont.1981).

It is clear, therefore, that in situations where there are sufficient factors shown to suggest a different level of risk borne by the subsidiary—where there are outside dealings, for example, it may be unreasonable to hold the subsidiary to the same rate of return found to be fair for the utility. While there are no doubt instances of such a degree of integration and utility dominance of a subsidiary so as to justify treating it as part of the utility, the present case does not fit that category. Accordingly, we reverse as to the Commission's adoption of the California approach in this case and remand for a determination of a fair rate of return for WIDCo, as a basis for the Commission to determine the extent to which WWP's coal supply expenses may be included in its operating costs.[2]

2. The commission should take into consideration the fact that WIDCo actually sustained

losses in three years: 1971, 1972 and 1974, and its average rate of return for the ten-year peri-

Affirmed in part, reversed in part and remanded. Parties bear their own costs.

SCOGGIN, J., Pro Tem, concurs.

DONALDSON, C.J., concurs in the result.

BAKES, Justice, concurring in part and concurring in the judgment:

I concur in that part of the majority opinion which rejects the so-called "California approach" adopted by the Public Utilities Commission in this case. However, I cannot concur with Part I of the Court's opinion which states that, from a review of the record, we "cannot say that the Commission has acted arbitrarily or abused its discretion in holding that WWP's proof of arm's-length negotiations was not controlling on the issue of reasonableness of price." *Ante* at 1010. As the Court's opinion points out, "it is the Commission's position that the presence of arm's-length bargaining in the WIDCo coal pricing agreements was irrelevant because there is insufficient evidence of a competitive market." *Ante* at 1010. However, the presence of arms-length bargaining is *never* irrelevant, and the degree of competitiveness in the market from which the utility is purchasing any given product is only one evidentiary factor to be considered by the commission in determining whether the price paid is reasonable. For example, if one assumed that WWP held no ownership interest in the WIDCo coal mining operation, there still would be "insufficient evidence of a competitive market" according to the commission, and yet if WWP arrived at a coal purchase agreement by arms-length bargaining with such a non-affiliated company, that agreement would satisfy the presumption of reasonableness set out in *Boise Water Corporation v. Idaho Public Utilities Comm'n,* 97 Idaho 832, 555 P.2d 163 (1976), and WWP would be entitled to include the entire price of that coal in its rate, in the absence of the commission proving that it was unreasonable. If an electric utility has a need for additional generating capacity and elects to build a coal-fired thermal plant adjacent to a coal mine in which it owns no ownership interest, the utility may include in its rate structure the cost of procuring the coal from that mine without any further showing of reasonableness, even though there is no competition in the market in the sense used by the commission in that all other sources of coal are so far distant that the transportation costs would be prohibitive. The burden would be on the commission to prove that the price of coal paid by the utility was so high that it unreasonably increased the electric rates of the utility, and then that determination would seemingly have to be made prospectively before the utility invested the huge amounts that are necessary to construct such a facility. Thus, "the Commission's position that the presence of arm's-length bargaining in the WIDCo coal pricing agreements was irrelevant because there was insufficient evidence of a competitive market," *ante* at 1010, is a basic misconception of the law as it relates to the allowance of operating expenses by a utility.

Our case law is clear that to make out a *prima facie* case for the reasonableness of operating expenses paid to a non-affiliate, a utility must merely show actual incurrence of the expenses. The burden then shifts to the commission to show by substantial competent evidence that the payments were due to inefficiency or bad faith. *Boise Water Corp. v. Idaho Public Utilities Comm'n, supra.* However, when the transaction is between affiliated entities, the utility's burden is greater. This distinction between affiliated and non-affiliated transactions exists because:

"In dealing with *non-affiliates* the pressures of a competitive market and the fact of arm's length bargaining for goods and services allows us to assume, in absence of a showing to the contrary, that such operating expenditures are legiti-

od 1971 to 1980, from operation of the mine was only 7.22%, substantially less than the rate of return authorized to WWP. The commission might also take note of the signifi-

cance, if any, of the "depletable resource" factor in calculating the coal company's fair rate of return. *See, Application of Montana-Dakota Util.Co.,* 278 N.W.2d 189 (S.D.1979).

mate." *Boise Water Corp. v. Idaho Public Utilities Comm'n,* 97 Idaho at 838, 555 P.2d at 169.

The existence of a non-affiliated transaction requires the commission to prove the unreasonableness of the transaction, because in that circumstance it is reasonable to assume that by arms-length bargaining between two unrelated entities the price paid by the utility is a fair and reasonable one. It is the presumed presence of arms-length bargaining in a non-affiliated transaction which satisfies the utility's burden of proof. However, with regard to transactions between affiliates, no such presumption occurs, and the utility must prove the reasonableness of the price paid.

The transaction in question here involving coal purchases by WWP from WIDCo in many respects more closely resembles a transaction between non-affiliates than between affiliated companies. The coal reserves are owned jointly by WIDCo and Pacific Power & Light Co. WIDCo is the operator of the mine. The coal purchase agreement negotiated between WIDCo, as seller, and the eight participating utilities which operate the Centralia coal-fired generating plant, as purchasers, does not permit the two majority owners of the generating plant, WWP and Pacific Power & Light, to participate in setting the price for the coal for the Centralia plant. The price is negotiated with WIDCo by the six utilities who have no ownership interest in the coal mining operation. Thus, while WWP shares in WIDCo's profits (and the losses) of the WIDCo coal mining operation, it has no say in the negotiations for the price of that coal.

Before WIDCo can increase the price of coal, it must give the six participating utilities six months' notice. These utilities have an opportunity to demand the books and records of WIDCo to determine the reasonableness of WIDCo's proposed price before negotiating. In the event that WIDCo and the six utilities are unable to agree on a price, the matter is to be submitted to arbitration. In the final event that the six utilities who participate in negotiating the price of the coal still are unsatisfied, they can terminate WIDCo's right to mine the coal and obtain another operator for the coal mine.

The commission nevertheless concluded that, because it found a lack of a competitive market in coal in the Centralia area, it would apply the so-called California approach and arbitrarily reduce WWP's coal purchase allowance to a figure which would yield to WIDCo the same return as WWP was authorized to receive. The commission was not satisfied that the coal supply agreement in this case sufficiently guaranteed the fairness of the price charged for the coal and, finding no competitive market for coal, rejected the traditional approach of evaluating the reasonableness of the charges for coal paid by WWP in favor of "the 'California approach' as a safeguard to ensure that the subsidiary receives the same rate of return as the parent utility."[1]

However, the California approach does not ensure that the subsidiary will receive the same rate of return as the utility. It only ensures that it will *never* receive more, at least on the business it conducts with the utility. It does not guarantee that the affiliate's rate of return will be the same as the utility's. In this case, for example, WIDCo actually sustained losses in three years, 1971, 1972 and 1974, and its average rate of return for the ten years, 1971 to 1980, from operation of the mine was only 7.22%, substantially less than WWP's authorized rate of return. In the test year, its rate of return was higher than WWP's, so as a result WWP's allowance for coal was reduced below what it actually paid in order "to ensure" that WIDCo's rate of return did not exceed that of the utility's. However, there is nothing in the cases adopting the California approach, or in the record in this case, to suggest that in years when WIDCo's return was less than WWP's authoriz-

1. Having adopted the "California approach," the commission concluded on rehearing that "additional evidence on the issue of whether or not arms length bargaining occurred would be immaterial."

ed rate of return WWP was allowed a greater allowance for its coal purchases than it actually paid for the coal, in order to ensure that WIDCo would receive the same rate of return as its parent, WWP. The "California approach," at least as applied in this case, is a one-way street.

Accordingly, I concur in the majority's rejection of the so-called "California approach" and the remand of the matter to the commission to determine a reasonable coal cost to WWP which will allow a reasonable rate of return for WIDCo with its different set of risks and needs. Based upon those findings, the commission can then determine whether or not the price which WWP pays to WIDCo will result in an unreasonable return to WIDCo. In this regard, WWP presented expert testimony that WIDCo's rate of return was less than that of companies which were most nearly comparable. The witness did acknowledge the absence of an industry norm, a fact which the commission prominently relied on in its order. Nevertheless, he rendered an expert opinion that WIDCo's actual rate of return in the test year was unreasonably low, considering the risks involved, and that the rate of return proposed by the commission was even more unreasonably low.

However, there was *no* evidence offered by the staff to support the commission's finding that WIDCo's rate of return in the coal mining operation should be the same as WWP's rate of return. Not only did the staff fail to present evidence that the price WWP paid to WIDCo was unreasonable, they also presented no evidence that the rate of return finally allowed to WIDCo is a reasonable rate of return for WIDCo. The staff's expert witness testified that she made no study on a fair rate of return for a coal mining operation because she did not think it was relevant. She further stated that she had made no study showing the comparative risks of a coal mining operation and a utility such as WWP, and when asked the basis for her opinion that there was no greater risk in a coal mining operation, she replied, "It's intuitive." She also testified that she made no study of the reasonableness of the price set by WIDCo

for its coal and rejected the position of WWP that the coal supply agreement was evidence of a reasonable value set in an arms-length transaction.

The commission adopted the position of the staff witness, stating that, "It is not possible to compare the price of WIDCo with that of any other coal supply source," and that "the minority owners or an arbitrator would find it no easier to determine a reasonable price than this commission has found it to be."

However difficult those factual questions are to decide, that is the commission's function, and it cannot use an arbitrary formulation such as the so-called "California approach" as a substitute for making the difficult factual determinations that it is charged by law to make.

We indicated in *WWP I* that it was for the commission, in the first instance, after the parties produced evidence in support of their views, to decide what standard should be used to determine reasonableness in this case. However, as we also noted, it is for the courts on review to determine, based upon the record made, whether the approach adopted by the commission is arbitrary or unreasonable. If it is arbitrary or unreasonable, as the Court rules today that it was, it must be rejected by this Court. *Washington Water Power Co. v. Idaho Public Utilities Comm'n, supra.*

The California approach, as applied by the commission in this case, which automatically limits WWP to a deduction for coal charges of an amount which would yield a return to WIDCo no greater than the return the parent utility is entitled to earn, without any evidence to support that rate of return, was an arbitrary act by the commission. There is no disagreement among the members of the Court on that issue.

The transaction in question is one between a subsidiary and parent, and should be, of course, subject to strict scrutiny by the commission. It does not follow, however, that because it is subject to strict scrutiny the subsidiary should automatically be limited to no greater return than its

parent. The predetermined rate of return allowed to a utility is one which the commission has determined is a reasonable rate of return for a *public utility,* with its set of risks. As a result, its profits are essentially guaranteed at a level to produce that rate of return. The same rate of return might very well be *unreasonable* for a coal producing company, where the risks are greater, and there is no guarantee. Thus, in mechanically applying the California rule and in assuming the utility's rate of return for WIDCo's coal mining operations, with no evidence to support that assumption, the commission failed in its responsibility to determine a fair allowance for WWP's coal purchases. While one factor to be considered by the commission is whether the contract price would result in an unreasonable rate of return to WIDCo, the commission cannot arbitrarily assign a rate of return to the subsidiary that has previously been determined as reasonable only for the parent utility which has entirely different costs and risks.

The California approach has been recently rejected by other courts for similar reasons. In *Montana-Dakota Utilities Co. v. Bollinger,* 632 P.2d 1086 (Mont.1981), the Montana Supreme Court noted:

"It does not automatically follow, however, that the coal company should be held to the same rate as its parent public utility. Nor does it follow that the parent is only allowed to receive the same rate of return on the investment in its coal subsidiary as it receives on its utility property, with respect to sales between the subsidiary and the parent. If any limitation on coal profits or ratepayer coal expense is in order, it should be based on a reasonable rate of return as established by a comparable marketplace, not upon a predetermined rate as established for a regulated utility." 632 P.2d at 1090.

The court in *Bollinger* rejected the California approach as unreasonable, saying: "We note, however, that the majority of those cases using this [the California] approach involve the Bell Telephone System

and its manufacturing subsidiaries. These subsidiaries sell virtually all their manufactured products to the parent, Bell Telephone—a fact which is materially different from the present situation where the bulk of Knife River coal (a depletable natural resource) is sold to customers other than its parent .... Such an approach should not be deemed applicable in this instance." 632 P.2d at 1091.

Some of the factors mentioned by the court from which it drew its conclusions were the fact that the coal company also sold its product to entities other than Montana-Dakota Utilities (which presumably included negotiations resulting from arms-length bargaining, thus producing a resulting price more reliable than one negotiated solely between parent and subsidiary); the fact that the coal business is a much different business than a utility concern; that coal is a depreciable resource, etc.

The same considerations apply here. WIDCo is a coal company, not a utility, and the fact that it is a subsidiary of WWP should subject transactions between the two to strict scrutiny, but should not bind WIDCo to a rate of return equal to that of WWP. The primary, but not the sole factor that should be considered in determining the reasonableness of a commodity price purchased by a utility is the presence of arms-length bargaining. Others include a comparison of the prices paid by others for coal to the prices paid by the utility, and a comparison of the rate of return on the coal mining operation with other comparable mining operations.

The South Dakota Supreme Court has also recently rejected the California approach, saying:

"While the rate of return on wholly-owned coal companies is subject to close scrutiny under SDCL 49-34A-19.2, it does not follow that the coal companies should be held to the same rate of return as a public utility. First, they are not subject to the authority of the Commission. Secondly, the rate of return to coal companies, because of the depletion factor, cannot be considered on the same

basis as a utility which buys its raw materials on the competitive market and sells its electricity to the consumer based upon a rate fixed by the various costs of doing business." *Application of Montana-Dakota Util. Co.,* 278 N.W.2d 189, 193 (S.D.1979).

Another case that discussed the difference between the two approaches and rejected the California approach is *Central Louisiana Electric Co. v. Louisiana Public Service Comm'n,* 373 So.2d 123 (La.1979). In that case the court also noted that all of the cases adopting the California approach involved telephone equipment companies with near monopolies, and thus were clearly distinguishable from the situation where a commission is considering prices charged by a coal producing company. The court rejected the California approach, saying:

"However, in a case such as the instant proceeding, in which the subsidiary's operations are not closely integrated in those of the parent but include substantial dealings with non-affiliated customers, and in which the subsidiary encounters business risks markedly different from its parent's, the fair rate of return of the subsidiary and not that of the parent should be the touchstone for determining if the subsidiary's profits are unreasonable and for making any indicated adjustments." 373 So.2d at 129.

The evidence presented at the commission level in the present case indicates the existence of arms-length bargaining. The price of coal charged to WWP was set in a long term contract negotiated between WIDCo and the six minority owners of the Centralia Power Plant.[2] Neither WWP nor Pacific Power & Light, the other majority owner of the Centralia plant, are allowed to participate in changes in the base coal price. The contract is a long term one, establishing a base price, and providing for automatic increases as certain expenses increase. However, WIDCo was required to give six months' notice if it intended to ask for an increase for any other reason. WIDCo is required under the agreement to give the minority owners of the Centralia plant access to its books and records for audit, for purposes of determining the validity of WIDCo's demand for a price increase. The owners may require WIDCo to furnish data supporting the proposed increase. The owners may also hire outside consultants. After negotiation with the minority owners, if an agreement cannot be reached, the minority owners may either demand arbitration or may discharge WIDCo and contract with another company to operate the mine. Because WWP owns only a 15% interest in the Centralia plant, and is not the operating company for that plant, it is in effect only buying 15% of the output of the mine from its subsidiary WIDCo. The balance is purchased by the other utilities who not only set their own price by negotiation, but in that same process set the price which WWP must pay.

The importance of arms-length bargaining in determining a reasonable price for coal should not be underestimated, and in no case should evidence of arms-length bargaining be summarily rejected as immaterial as the commission did in this case after it determined to adopt the California approach. Such summary rejection can only lead to an arbitrary judgment, a result which is forbidden by law.

Evidence of comparative market prices should also always be considered. The difficulty of comparing coal prices because of the various factors involved should not be a deterrent to allowing and considering evidence of comparative market prices. As the Montana court said in *Bollinger:*

---

2. The owners of the Centralia plant and their percentage interests in the plant are:

| | |
|---|---|
| Pacific Power & Light Co. | 47.5% |
| Washington Water Power Company | 15.0% |
| Puget Sound Power & Light Company | 7.0% |
| Portland General Electric Company | 2.5% |
| PUD No. 1 of Gray's Harbor County | 4.0% |
| PUD No. 1 of Snohomish County | 8.0% |
| The City of Seattle | 8.0% |
| The City of Tacoma | 8.0% |

Only the six minority owners are allowed to vote on, or negotiate price changes under the WIDCo contract.

"While it is true that the PSC found that absolute comparability between coal prices impossible to determine, it appears to this Court that the prices paid by a number of other companies to Knife River for two-thirds of its coal production is evidence of a competitive market for comparison to the Knife River price paid by MDU. In addition, there was evidence of prices charged by other companies in the competitive area." 632 P.2d at 1092.

The other non-affiliated companies were, in effect, purchasing coal from WIDCo under the same contract. Prices paid by those non-affiliated companies, negotiated directly by them with WIDCo, constituted evidence of the price those buyers were willing to pay for coal and was competent evidence of competitive market prices.

The commission's summary rejection of the evidence offered by WWP to prove its case is illustrative of the arbitrariness of the California approach. Any approach that allows the commission to reject summarily evidence presented on the reasonableness of a price paid for a commodity, and allows the commission to arbitrarily set a rate of return without inquiry into the reasonableness of that rate of return for the particular company under consideration, is arbitrary and unreasonable and by our opinion today has been rejected. *Montana-Dakota Utilities Co. v. Bollinger, supra; Application of Montana-Dakota Utilities, supra; Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, supra.*

I join in the Court's judgment reversing the order of the Public Utilities Commission.

SHEPARD, J., concurs.